IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 45 MAP 2016 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court dated September 4, 2015, |
| | : | reconsideration denied November 10, |
| v. | : | 2015, at No. 1764 EDA 2014 Affirming |
| | : | the Judgment of Sentence of the |
| | : | Northampton County Court of Common |
| QU'EED BATTS, | : | Pleas, Criminal Division, dated May 2, |
| | : | 2014 at No. CP-48-CR-0001215-2006 |
| Appellant | : | |
| | : | ARGUED:  December 7, 2016 |

**OPINION**

JUSTICE DONOHUE                                   DECIDED:  June 26, 2017

Qu'eed Batts ("Batts") was convicted of a first-degree murder that he committed when he was fourteen years old.  His case returns for the second time on discretionary review for this Court to determine whether the sentencing court imposed an illegal sentence when it resentenced him to life in prison without the possibility of parole.  After careful review, we conclude, based on the findings made by the sentencing court and the evidence upon which it relied, that the sentence is illegal in light of *Miller v. Alabama*,  567 U.S. 460 (2012) (holding that a mandatory sentence of life in prison without the possibility of parole, imposed upon a juvenile without consideration of the defendant's age and the attendant characteristics of youth, is prohibited under the Eighth Amendment to the United States Constitution), and *Montgomery v. Louisiana*,

136 S.Ct. 718 (2016) (holding that the *Miller* decision announced a new substantive rule of constitutional law that applies retroactively and clarifying the limited circumstances in which a life-without-parole sentence is permissible for a crime committed when the defendant was a juvenile).

Pursuant to our grant of allowance of appeal, we further conclude that to effectuate the mandate of *Miller* and *Montgomery*, procedural safeguards are required to ensure that life-without-parole sentences are meted out only to "the rarest of juvenile offenders" whose crimes reflect "permanent incorrigibility," "irreparable corruption" and "irretrievable depravity," as required by *Miller* and *Montgomery*. Thus, as fully developed in this Opinion, we recognize a presumption against the imposition of a sentence of life without parole for a juvenile offender. To rebut the presumption, the Commonwealth bears the burden of proving, beyond a reasonable doubt, that the juvenile offender is incapable of rehabilitation.

## I. Facts

Although this Court generally does not provide an exhaustive recitation of an offender's history prior to the commission of the crime, as we explain in greater detail later in this Opinion, *Miller* requires the sentencing court to consider the details of a juvenile offender's background when determining if he or she is eligible for a sentence of life without parole. As such, we provide a lengthy account of Batts' life preceding his commission of the murder, based largely on the findings of fact made by the resentencing court that are supported by the record.

Batts was born prematurely on April 18, 1991 to a thirteen-year-old mother and seventeen-year-old father. A victim of his mother's neglect, Batts was shuffled around

the foster care system from ages five through twelve. During that timeframe, he lived in eleven homes (as well as a homeless shelter for youth) located in nine cities and two states, and transferred schools eleven times (although there were stretches of several months that, because of his transiency, Batts did not attend school at all). He was exposed to physical violence by foster parents, subjected to physical violence by his peers, and on one occasion, was victimized sexually by an older cousin. At age eleven, while in the homeless shelter, he lost his virginity to a thirteen-year-old female resident. He frequently got into fights at school because children would tease him about his circumstances. Through it all, however, Batts performed well academically and excelled in several sports.

At some point during his childhood, Batts developed a relationship with his father, who was in and out of jail during Batts' formative years. That relationship abruptly ended, though, when Batts was eight, as his father was sentenced to twelve years of incarceration on federal drug charges and no visitation was provided. Around that same time, Batts briefly returned to the care of his mother, but he was removed again when she struck him in front of school officials and said she no longer wanted him.

According to Batts, he struggled with feelings of abandonment and rejection because of his familial circumstances. He desired only to live with his mother, but she failed to comply with the requirements for reunification established by the county agency. It was only once Batts' paternal grandfather, who had been his caregiver on and off over the years, expressed a desire to adopt him that Batts' mother finally completed the tasks required for her to regain custody of her son.

At the age of twelve, Batts returned to his mother's care in Phillipsburg, New Jersey. They resided in an apartment with his mother's boyfriend, Batts' younger sister, and eventually, a baby brother. Batts reportedly bonded with his mother and her boyfriend and was happy to be home. He attended Phillipsburg Middle School in the seventh grade, where he played football, but he began to decline academically and was suspended several times for fighting.

He became sexually active in the seventh and eighth grades, began drinking alcohol and experimented with smoking marijuana. It was at this time that he met Jerome Evans, an older teen who was a member of the Bloods gang. He told Batts that the gang was a family group that took care of each other, which Batts found enticing. Batts began associating with the gang when he was in middle school and sold drugs for them.

Batts and his family relocated across the river to Easton, Pennsylvania, but he continued to attend school in Phillipsburg, where he played basketball and football. In late December or early January of his ninth grade year, Batts was initiated into the Bloods by getting "jumped in" – a ritual that required him to fight five different gang members for thirty-six seconds each.

Batts' grades plummeted, prompting his mother to withdraw him from basketball. He argued with his mother about his failure to do his school work and began skipping school. On February 2, 2006, Batts went out in the evening and did not return home until 2:00 a.m. When he arrived home, his mother was angry and struck him. As a result, at the age of fourteen, Batts packed his clothes, left for school the morning of

February 3 and never returned home. He stayed at his girlfriend's house and in the homes of other friends in both Easton and Phillipsburg. He stopped attending school.

On the night of February 7, 2006, Batts was in a vehicle with several members of the Bloods gang. Vernon Bradley, a senior member of the Bloods to whom Batts had recently been "assigned," was in the car talking about his desire to rob and kill someone. Bradley directed the driver of the vehicle to the 700 block of Spring Garden Street in Easton, Pennsylvania, where he saw Clarence Edwards and Corey Hilario outside. In the preceding days, Bradley told Batts on several occasions that he was going to kill Edwards. Batts was aware that Bradley had previously killed three other people.

Bradley instructed the driver to stop the vehicle. He asked Batts and the two other young teenagers in the back of the car who was going to put in "work." None of the passengers responded. The record reflects that Bradley then turned to Batts, handed him a gun and a mask, and told him to put on a glove and "put work in." Upon receiving that directive, Batts exited the car, walked up to the house and shot Clarence Edwards twice in the head, killing him, and shot Corey Hilario once in the back as Hilario fled into the house, causing him serious bodily injury. Edwards and Hilario were sixteen and eighteen years old, respectively. At the time of the shooting, Batts did not know either victim.

When Batts returned to the car, he gave the gun back to Bradley. Although Batts indicated that he felt nothing at the time he pulled the trigger, immediately after the shooting he stated that he regretted what he had done and was scared. Bradley stated that he was pleased with the "work" Batts had done, and thereafter, Batts was promoted

to a higher rank within the Bloods. According to Batts' statement to police and his testimony at trial, he participated in the shooting because he was afraid that if he did not comply with Bradley's demands, Bradley would kill him.

Batts spent the night at Bradley's house and the following day, went to Phillipsburg, New Jersey. On February 10, 2006, police located Batts at a house there. Batts initially attempted to shield his identity from the police, but he was ultimately arrested and brought in for an interrogation, for which his mother and stepfather were present. He waived his *Miranda* rights and after two attempts to disclaim his involvement in the shooting, Batts confessed.

## II. Procedural History

The Commonwealth charged Batts with criminal homicide, attempted criminal homicide, aggravated assault, and two counts of criminal conspiracy.[1] As we explained in our prior consideration of this case, despite his age, the homicide charge removed the matter from the jurisdiction of the juvenile court and required Batts' case to be filed in adult criminal court. *See Commonwealth v. Batts*, 66 A.3d 286, 288 (Pa. 2013) ("*Batts I*"); 42 Pa.C.S. § 6302 (excepting murder from the definition of a delinquent act). Batts filed, inter alia, a pretrial motion requesting the transfer of his case to juvenile court. The trial court held a hearing on Batts' motion on January 29 and 30, 2007. In support of his motion, Batts presented the expert testimony and written report of forensic psychologist Dr. Allan M. Tepper; the Commonwealth countered with expert testimony and reports from forensic psychologist Dr. Steven Samuel and forensic psychiatrist Dr. Timothy Michals. Both sides also presented lay testimony.

---

[1] 18 Pa.C.S. §§ 2501(a), 901(a), 2702(a)(1), 903(a)(2).

After considering the evidence presented, the trial court concluded that Batts failed to satisfy his burden of proving by a preponderance of the evidence that the public interest would be served by decertifying the matter to juvenile court. *See* 42 Pa.C.S. § 6322(a). In its consideration of the statutorily required factors,[2] the trial court found that the crime was "horrendous" and negatively impacted the community; that Batts constituted a "severe threat to the public" and was "'streetwise,' with 'a well-developed criminal mentality and the degree of maturity necessary to commit audacious criminal

---

[2] In determining whether transferring the case to the juvenile court would serve the public interest, the sentencing court was required to consider:

> (A) the impact of the offense on the victim or victims;
> (B) the impact of the offense on the community;
> (C) the threat to the safety of the public or any individual posed by the child;
> (D) the nature and circumstances of the offense allegedly committed by the child;
> (E) the degree of the child's culpability;
> (F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and
> (G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:
>> (I) age;
>> (II) mental capacity;
>> (III) maturity;
>> (IV) the degree of criminal sophistication exhibited by the child;
>> (V) previous records, if any;
>> (VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;
>> (VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;
>> (VIII) probation or institutional reports, if any;
>> (IX) any other relevant factors[.]

42 Pa.C.S. § 6355(a)(4)(iii); *see* 42 Pa.C.S. § 6322(a).

acts.'" *Batts I,* 66 A.3d at 288-89 (quoting Trial Court Order, 2/21/2007, at 5-6). The trial court rejected Dr. Tepper's conclusion that Batts could be rehabilitated by the age of twenty-one (the age at which the jurisdiction of the juvenile court terminates, *see* 42 Pa.C.S. § 6302 (defining "child"); Pa.R.J.C.P. 630), instead crediting the conclusion shared by the Commonwealth's experts "that rehabilitation, if it ever occurs, will occur only after years of treatment and a willingness on the part of Mr. Batts to seek treatment and rehabilitation, something that their clinical evaluations indicate Mr. Batts is not ready to accept." Trial Court Order, 2/21/2007, at 6.

The case proceeded to a jury trial before the Honorable William F. Moran in the Northampton County Court of Common Pleas. Batts advanced a defense of duress based upon his fear that Bradley would kill him if he did not comply with his orders. On July 31, 2007, following a six day trial, the jury convicted Batts of first-degree murder,[3] attempted murder and aggravated assault. On October 22, 2007, the sentencing court imposed the then-mandatory term of life in prison without the possibility of parole for his first-degree murder conviction, *see* 18 Pa.C.S. § 1102(a) (amended effective Dec. 16, 2008 and Oct. 25, 2012), and a concurrent sentence of six to twenty years of incarceration for attempted murder (into which his aggravated assault conviction merged for sentencing purposes).

## A. First Superior Court Appeal

Following the denial of post-sentence motions, Batts appealed the decision to the Superior Court raising, in relevant part, a challenge to the constitutionality of a life-without-parole sentence imposed upon a juvenile in light of the United States Supreme

---

[3] 18 Pa.C.S. § 2502(a).

Court's decision in *Roper v. Simmons*, 543 U.S. 551 (2005) (holding that the Eighth Amendment to the United States Constitution prohibits the imposition of the death penalty for a crime committed by a juvenile). The Superior Court affirmed Batts' judgment of sentence in an unpublished memorandum, concluding that because Batts was not sentenced to death, *Roper* was inapplicable. It further found that his constitutional challenge to the mandatory nature of his life-without-parole sentence was meritless. *See Commonwealth v. Batts*, 766 EDA 2008, 12-16 (Pa. Super. April 7, 2009) (unpublished memorandum).

## B.  *Batts I*

This Court granted allowance of appeal but held the matter pending the decision of the United States Supreme Court in *Graham v. Florida*, 129 S.Ct. 2157 (2009), *decided*, 560 U.S. 48 (2010), and *Sullivan v. Florida*, 129 S.Ct. 2157 (2009), *writ of certiorari dismissed as improvidently granted*, 560 U.S. 181 (2010). Subsequent to the decision in *Graham*, Batts' case was argued before this Court, following which we withheld decision pending the disposition of *Miller v. Alabama*, 565 U.S. 1013 (2011) (per curiam), and *Jackson v. Hobbs*, 565 U.S. 1013 (2011) (per curiam), *decided together*, 567 U.S. 460 (2012). *Batts I* was the first post-*Miller* decision from this Court addressing the sentencing of a juvenile offender convicted of first-degree murder. We therefore requested supplemental briefs and argument from the parties addressing the appropriate remedy and availability of relief for Batts and those similarly situated. *See Batts I,* 66 A.3d at 293 (citing *Commonwealth v. Batts*, 79 MAP 2009, July 9, 2012 Order (per curiam)).

In the interim, the Pennsylvania General Assembly responded to *Miller* by enacting a new sentencing statute for juveniles convicted of first- and second-degree murder after June 24, 2012.[4]   *See* 18 Pa.C.S. § 1102.1(a), (c).  As it relates to first-degree murder, section 1102.1 requires defendants who were under the age of fifteen at the time of the offense to be sentenced, at a minimum, to twenty-five years to life in prison, or to a term of life in prison without the possibility of parole.  18 Pa.C.S. § 1102.1(a)(2), (e).   Offenders who committed first-degree murder when they were between the ages of fifteen and eighteen must be sentenced, pursuant to the statute, to a minimum of thirty-five years to life in prison, or to a term of life in prison without the possibility of parole.  18 Pa.C.S. § 1102.1(a)(1), (e).  If the Commonwealth intends to seek a sentence of life without the possibility of parole, it must provide reasonable notice to the defendant following his or her conviction, prior to sentencing.  18 Pa.C.S. § 1102.1(b).  In making its determination of whether to sentence a defendant to life in prison without parole under subsection (a), the sentencing court is required to consider and make findings on the record related to the following factors:

> (1) The impact of the offense on each victim, including
> oral and written victim impact statements made or
> submitted by family members of the victim detailing the
> physical, psychological and economic effects of the crime
> on the victim and the victim's family. A victim impact

---

[4]   The United States Supreme Court issued its decision in *Miller* on June 25, 2012.  We perceive the Legislature's choice of date to be based upon its belief that the holding of *Miller* would only apply prospectively. Its limitation of the statute to juveniles "convicted" after June 24, 2012, however, is inconsistent with the concept of prospectivity as applied to judicial determinations.  Under conventional jurisprudence, individuals whose judgments of sentence were not yet final on the date of the *Miller* decision (i.e., those with cases still pending on direct appeal), such as Batts, would have been entitled to benefit from its holding.  *See Commonwealth v. Dickson*, 918 A.2d 95, 99 (Pa. 2007).

statement may include comment on the sentence of the defendant.

(2) The impact of the offense on the community.

(3) The threat to the safety of the public or any individual posed by the defendant.

(4) The nature and circumstances of the offense committed by the defendant.

(5) The degree of the defendant's culpability.

(6) Guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing.

(7) Age-related characteristics of the defendant, including:

(i) Age.

(ii) Mental capacity.

(iii) Maturity.

(iv) The degree of criminal sophistication exhibited by the defendant.

(v) The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.

(vi) Probation or institutional reports.

(vii) Other relevant factors.

18 Pa.C.S. § 1102.1(d).

In rendering our decision in *Batts I,* we took note of section 1102.1, but ultimately concluded that it was inapplicable because of the date of Batts' conviction. *Batts I,* 66 A.3d at 293. In Batts' supplemental brief and argument to this Court, he contended that, in light of *Miller*, Pennsylvania's sentencing scheme for first-degree murder, requiring a mandatory sentence of life without parole, was unconstitutional in its entirety. He

asserted that his sentence should thus revert to "the most severe lesser included offense, namely, third-degree murder[.]" *Id.* at 294. We found that argument, and the inapposite case law presented in support, to be unavailing. Rather, we agreed with the Commonwealth and its amicus, the Pennsylvania District Attorneys Association, that in sentencing a juvenile convicted of first-degree murder, if the sentencing court found, after considering the requisite factors, that a life-without-parole sentence was not appropriate, the problematic portion of the first-degree murder sentencing scheme was severable, and we could save the remaining portion of the legislative enactments without offending the pronouncement in *Miller* or our rules of statutory interpretation. *See id.* at 295-97. Specifically, the Court noted that section 1102 of the Crimes Code required, in relevant part, an individual convicted of first-degree murder to be sentenced "to a term of life imprisonment." 18 Pa.C.S. § 1102(a)(1). The "without parole" aspect of the sentence arose from section 6137(a)(1) of the Parole Code, which prohibited the release on parole of any person sentenced to life imprisonment. 61 Pa.C.S. § 6137(a)(1).

We therefore held that juveniles convicted of first-degree murder prior to *Miller* could, after the sentencing court's evaluation of the criteria identified in *Miller*,[5] be

---

[5] We concluded that when sentencing a juvenile facing a potential life-without-parole sentence, *Miller* requires examination of the following factors:

> [A]t a minimum it should consider a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol

(continued…)

subjected to a sentence of life in prison without the possibility of parole. *See Batts I,* 66 A.3d at 296. For those defendants for whom the sentencing court determines a life-without-parole sentence is inappropriate, "it is our determination here that they are subject to a mandatory maximum sentence of life imprisonment as required by [s]ection 1102(a), accompanied by a minimum sentence determined by the common pleas court upon resentencing," *id.* at 297, striking the prohibition against paroling an individual sentenced to serve life in prison in section 6137(a)(1) as applied to these offenders.

This Court further rejected the argument advanced by Batts and his amici[6] that Article I, Section 13 of the Pennsylvania Constitution requires a categorical ban on the imposition of a life-without-parole sentence for crimes committed when the defendant was a juvenile. The Court found that "nothing in the arguments presented suggests that Pennsylvania's history favors a broader proportionality rule than what is required by the United States Supreme Court." *Id.* at 299. We therefore vacated the Superior Court's decision in *Batts I* and remanded the case to the sentencing court for proceedings consistent with the opinion.

Justice Baer authored a Concurring Opinion. He fully joined the Majority's pronouncement, but wrote separately to suggest, "for purposes of uniformity in

---

(…continued)
> history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation.

*Batts I,* 66 A.3d at 297 (quoting *Commonwealth v. Knox*, 50 A.3d 732, 745 (Pa. Super. 2012)).

[6] Batts' amici included the Juvenile Law Center, the Defender Association of Philadelphia, and law professors Sara Jacobson, Michelle Leighton, Brian J. Foley and Constance De La Vega. *See id.* at 297 n.4.

sentencing," that courts tasked with resentencing juveniles convicted prior to the *Miller* decision should look to section 1102.1 for guidance in setting a defendant's minimum sentence and to "follow the policy determinations" encompassed in the statute. *Id.* at 300 (Baer, J., concurring).

## C. Resentencing

On May 1, 2014, the sentencing court convened a second sentencing hearing before the Honorable Michael J. Koury (Judge Moran had since retired). The Commonwealth presented the testimony of Thomas Serbin, a Security Lieutenant at State Correctional Institution Retreat, where Batts was then housed. Lieutenant Serbin stated that Batts had been identified as being part of a security threat group based on Batts' admission when he entered the prison that he was a member of the Bloods, his continued association and interaction with other "validated" members of the Bloods while in prison, and items of contraband found in Batts' prison cell that the lieutenant indicated were associated with the Bloods. N.T., 5/1/2014, at 172-73, 179, 184, 188-94, 197-204. Delores Howell, Edwards' grandmother and primary caregiver from the age of six, provided victim impact testimony. *See id.* at 86-91.

The Commonwealth further presented an updated report and testimony of Dr. Michals as an expert in forensic psychiatry. *Id.* at 42. Based upon his evaluations of Batts (both prior to trial and in preparation for the resentencing hearing) and his review of various records, which included the results of an examination and psychological testing conducted by Batts' expert, Dr. Frank Dattilio, it was Dr. Michals' opinion that Batts' personality "is developmental in nature" and will not change. *Id.* at 49. According to Dr. Michals, "Batts is who he is and it's the engine that drives his behavior." *Id.* at 50.

Although Dr. Michals recognized that the psychological testing revealed that Batts "really is impulsive," "has poor judgment" and "acting out behavior," it was Dr. Michals' opinion that these traits are "just unfortunately part of who he is" and that this is his "biological genetic makeup." *Id.* at 50-51. Dr. Michals testified that it was his belief that people generally do not change as they age; that, "[c]haracteristics can change, but it's very difficult to make changes to the basic structure of our personality." *Id.* at 59; *see also id.* at 51, 60. He admitted, however, that he "can't say that they won't change," as he "can't predict the future." *Id.* He could only conclude that it was "highly unlikely" that Batts would change. *Id.* at 71-72.

At the time he evaluated Batts regarding his motion to transfer his case to juvenile court, it was Dr. Michals' opinion that Batts was not amenable to treatment in the juvenile system; seeing no changes in Batts' personality, he continued to hold that opinion at Batts' resentencing hearing. *Id.* at 57. Dr. Michals acknowledged, however, that Batts had not yet received any psychological treatment or counseling in the adult prison system, and that Batts had taken advantage of programs that had been made available to him. *Id.* at 50, 57, 72.

Also consistent with Dr. Michals' prior opinion, he testified at the resentencing hearing that Batts "made a purposeful decision to go ahead and get involved in the crime." *Id.* at 51. While Dr. Michals recognized that Batts was following the instructions of a senior gang member, and the violence of that organization may have played a role in Batts' decision to commit the murder, Dr. Michals believed that Batts "knew what he was doing when he committed the crime. … He made that choice and decision and acted upon that choice and decision." *Id.* at 60-61. Dr. Michals agreed that Batts'

childhood – marked by physical abuse, parental neglect, and repeated moves within the foster care system during his early childhood and adolescence – could have affected his decision making at the time of the murder, but in Dr. Michals' opinion, "it didn't," as the gang simply provided him with "an option." *Id.* at 64, 67.

Batts likewise presented the testimony and report of an expert – forensic psychologist Dr. Dattilio – at the resentencing hearing. Unlike Dr. Michals, Dr. Dattilio found Batts' tumultuous childhood to be highly significant in this matter. *Id.* at 99-100. Although Dr. Dattilio agreed with Dr. Michals that Batts knew that shooting and killing someone was wrong, he found that Batts' decision making was skewed by the absence of a traditional role model in his life during his early childhood. Dr. Dattilio opined that Batts thus lacked the ability to weigh his options and make an appropriate decision when he was directed by a senior gang member to do something he knew was wrong. *Id.* at 101-02, 156-57. According to Dr. Dattilio, the absence of "attachment bonds" with parents and family members when Batts was a young child affected his self-esteem and self-worth, resulting in "hardened personality characteristics," and left him particularly vulnerable to gang involvement. *Id.* at 100, 104-05; *see also id.* at 105 ("[A]ntisocial behavior and activity … not only go[] hand in hand with the environment he was raised in, but then certainly … the gang which had become his family is oriented in that direction.").

Further complicating Batts' decision making, in Dr. Dattilio's view, was Batts' age at the time of the shooting, which played "a major role":

> At 14-years-old [sic] we're just forming our sense of self, our sense of use of judgment and reason. It's in the process of development as is the brain. We know that anatomically the brain still doesn't stop developing until an individual is

> sometimes beyond 21 years of age, so there's a lot of things with regard to his ability to use judgment, to use reason, assertiveness, sense of balancing out risks versus rewards, so on and so forth, so he was very, very vulnerable at that point.

*Id.* at 107-08. Factoring in Batts' low-average IQ with his young age and his difficult childhood, Dr. Dattilio opined that Batts' judgment was profoundly compromised at the time of the shooting. *Id.* at 112.

Dr. Dattilio was also of the opinion that Batts' "level of sophistication[,] which was not very high," also affected his ability to make a sound decision. *Id.* at 108. While seemingly streetwise, Batts' judgment was clouded by the idea of "being part of a crowd" and gaining acceptance. *Id.* According to Dr. Dattilio, Batts did not appreciate "the shortcomings of having to put in work and doing what he was told or the consequences are serious." *Id.* In fact, despite the fact that Evans, his friend and fellow Bloods member, was jailed for criminal activity prior to Batts joining the Bloods, Dr. Dattilio stated that this did not "compute" for Batts. *Id.* at 109. To explain this ostensibly inexplicable disconnect, Dr. Dattilio reminded those in the courtroom, who had "level heads" and came from "environments that were in tact [sic] and balanced," that Batts was of an entirely different mindset because of his age and the "horrible environment" from whence he came. *Id.*

From the psychological testing he conducted, Dr. Dattilio concluded that Batts had matured since the initial mental status examination that was performed when Batts was a teenager. *Id.* at 104. It was Dr. Dattilio's opinion not only that Batts had the capacity to change, but he has exhibited that capacity in expressing genuine remorse for his actions. *Id.* at 110, 161. With therapy, Dr. Dattilio testified that Batts would be

able to address "the disruptive attachment bonds" of his childhood and learn how to find new, healthy relationships and connections. *Id.* at 111. Dr. Dattilio further accepted Batts' statement to him that he was no longer a gang member – in his view, the evidence adduced by Lieutenant Serbin to the contrary was unconvincing and unclear. *Id.* at 113-14, 145-53, 161.

Batts also presented a sentencing memorandum from expert Dana L. Cook, M.S., Deputy Director of The Atlantic Center for Capital Representation. She concluded, based on her review of records, interviews she conducted with Batts and his family members (particularly as it relates to Batts' traumatic childhood experiences and his current level of maturity) and the brain science relied upon by the United States Supreme Court in *Roper* and its progeny, that Batts "has an extraordinary amount of potential to be a law-abiding member of society, [which] will surely be enhanced by a now stable and loving family." Dana Cook's Report, 12/31/2013, at 4. In her view, Batts' "potential for rehabilitation cannot be understated," as her interactions with him show that "[h]e understands things now in [a] way he wasn't capable of at 14 years of age." *Id.*, Addendum at 3.

Batts' mother, Shaniqua Batts, testified regarding the positive changes she has already seen in her son. *Id.* at 165-67. Batts also testified, accepting responsibility for his actions, apologizing to Delores Howell, assuring the sentencing court that he has matured over the preceding decade, and denying that he continued to be a member of a gang. *Id.* at 169-71. His former high school principal, Gregory A. Troxell, sent an unsolicited letter to the sentencing court advocating for a term-of-years sentence for

Batts, portraying Batts' actions on the night in question as out of character from the person he had known over the preceding several years. *Id.* at 80-82.

Batts' prison record was also considered by the sentencing court. It revealed that Batts has been disciplined for five infractions throughout his post-sentence incarceration, only one of which was for a physical fight with another inmate during a basketball game in May 2010. *Id.* at 79, 118-20; N.T., 5/2/2014, at 34-35. Apart from several discipline-related suspensions, Batts has remained employed while in prison and participates in various sports, fitness and personal enrichment programs (including GED, leadership development, long-term offenders, violence prevention, resume creation and job application courses) offered to him there. N.T., 5/2/2014, at 33-34.

On May 2, 2014, following its consideration of the entire record, the sentencing memoranda submitted by the parties, an October 2013 presentence investigation report, the various reports from the psychological evaluations to which Batts had been subjected over the life of the case, and the sentencing memorandum prepared by Dana Cook, the sentencing court provided a lengthy explanation of its findings. It indicated that in deciding the appropriate sentence for Batts, it took into account the general factors in section 9721(b) of the Sentencing Code,[7] the *Miller* factors and the factors identified in 18 Pa.C.S. § 1102.1(d), concluding that its sentencing decision required a "balancing of the factors" at issue. N.T., 5/2/2014, at 56.

---

[7] In imposing a sentence, the court is required to adhere to "the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. The court shall also consider any guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing and taking effect under section 2155." 42 Pa.C.S. § 9721(b).

The sentencing court found the following to "weigh against leniency":

- "the nature and circumstances" of the crime, i.e., that Batts committed a premeditated murder and attempted murder of "two defenseless boys" to achieve a promotion within the gang;

- he acted alone in committing the killing;

- there was no justification for the crimes; the sentencing court found his assertion that he feared reprisal by Bradley to be incredible, and that his claim of peer pressure did not merit consideration as Batts "sought out and embraced the peer pressure by seeking membership in the Bloods gang";

- the victims were unarmed and unsuspecting teenagers;

- Batts failed to cooperate with police in that he "fled the state" and attempted to hide his identity when police located him, lied during the initial interrogation and only confessed when he realized the police already had evidence implicating him;

- the impact the crimes have had on Hilario, Edwards' family, and the community;

- the sentencing court's desire not to minimize the seriousness of the crimes;

- "the uncertainty of [Batts'] amenability to treatment," noting "[a]lthough you may ultimately prove to be amenable to treatment, the experts have indicated that any rehabilitation will require years of psychotherapy"; and

- the need to protect the public from Batts because of the crimes committed, his "history of violence, aggression and disrespect for the law," and the question of whether he could be amenable to treatment.

*Id.* at 56-60. As to factors weighing in favor of his capacity for change, the sentencing court found:

- Batts' "childhood experiences" – including his repeated moves in the foster care system throughout his formative years, the absence of an attachment to a stable and trusted adult, his exposure to violence by his mother and in the foster care system, as well as his sexual victimization by his cousin – all of which led him to seek out a cohesive and caring family, and made him vulnerable to the attractiveness of a street gang, which the sentencing court found suggested that he could "benefit from psychotherapy or other forms of rehabilitation";

- scientific studies concluding that juvenile offenders are less culpable than adults; however, the court found that Batts' age only slightly lessened his culpability here "because [his] crimes were not the product of recklessness, poor judgment, lack of foresight, susceptibility to peer pressure or weak impulse control," and instead "were deliberate and premeditated acts";

- Batts' showing of remorse, recognition of the wrongfulness of his conduct, and compassion for his victims;

- although Batts admitted to underage drinking, marijuana use and selling drugs for the Bloods, he had no prior criminal record, generally did well academically and excelled at various sports;

- he is employed in prison, has taken classes on leadership and violence prevention, and engaged in pre-vocational training;

- he has a close relationship with his family and attempts to be a positive role model for his younger brother; and

- expert opinions that, given his age and the insights he has gained since committing the crimes, years of psychotherapy could improve his "psychological condition."

*Id.* at 60-63. The sentencing court did not consider the evidence that Batts may have continued his association with members of the Bloods gang, as it found there was no evidence that he engaged in any violent gang activity in prison. *Id.* at 63.

The sentencing court found, "weighing all the factors[,] … that the factors not in [Batts'] favor significantly outweigh the factors in his favor," and that the crimes in question did not "reflect unfortunate yet transient immaturity." *Id.* at 64-65. Instead, the sentencing court found, "On the evening of February 7, 2006, you committed a calculated, callous and cold-blooded murder. You made yourself the judge, jury and executioner of Clarence Edwards and, if not for the grace of God, you would also have killed Corey Hilario." *Id.* at 66.

Immediately thereafter, the sentencing court reinstituted a sentence of life in prison without the possibility of parole for Batts' first-degree murder conviction, and

further resentenced him to a concurrent term of ten to twenty years of incarceration for attempted murder. *Id.* at 67. Judge Koury then went on to recount how, after he decided that Batts should serve life without parole for the murder, he drove by the crime scene and replayed the events of February 7, 2006 in his head, imagining Delores Howell coming out to the porch and seeing her grandson with two gunshot wounds to his head. *Id.* at 68.

### D.  Second Superior Court Appeal

A divided panel of the Superior Court affirmed the judgment of sentence. Of relevance to the case at bar, the majority opinion, authored by then-Judge (now Justice) Mundy, found Batts' claim that the evidence was insufficient to permit him to be subjected to a life-without-parole sentence was a challenge to the discretionary aspects of sentencing. *Commonwealth v. Batts*, 125 A.3d 33, 42 (Pa. Super. 2015). Because Batts failed to file a concise statement of reasons for the Superior Court to review the discretionary aspects of his sentence, as required Rule 2119(f) of the Pennsylvania Rules of Appellate Procedure, and the Commonwealth objected to this omission, the majority concluded that Batts had waived the claim. *Id.* at 44. The majority declined Batts' request to impose a burden of proof upon the Commonwealth seeking to impose a life-without-parole sentence for a juvenile or to apply a heightened standard of appellate review, concluding that the requested relief would have to come from the General Assembly or from this Court pursuant to our rulemaking power. *Id.* at 43; *see* Pa. Const. art. V, § 10(c). It further found meritless his claim that juveniles convicted of first-degree murder are entitled to the same constitutional protections as adults facing the death penalty. *Batts*, 125 A.3d at 44-45.

Former Justice (now Senior Judge) Fitzgerald disagreed with the finding of waiver of Batts' sentencing claim based upon his failure to comply with Rule 2119(f), giving three reasons for his dissent. First, murder is not a "felony or misdemeanor" subject to the discretionary review process. *See* 18 Pa.C.S. § 106(a) (listing three types of crimes: murders, felonies, and misdemeanors). As the jurisdictional requirements for the Superior Court to consider the discretionary aspects of sentencing in 42 Pa.C.S. § 9781(b) apply only to felonies and misdemeanors, he found a sentence for a murder conviction was not "subject to the discretionary review process." *Batts*, 125 A.3d at 49 (Fitzgerald, J., concurring and dissenting); *see* 42 Pa.C.S. § 9781(b) ("The defendant or the Commonwealth may file a petition for allowance of appeal of the discretionary aspects of a sentence for a felony or a misdemeanor to the appellate court that has initial jurisdiction for such appeals."). Second, the sentence for a juvenile convicted of first-degree murder does not arise from the Sentencing Code, thus further removing appellate review of the sentence from the strictures of section 9781(b). *Id.* at 49-50 (citing 42 Pa.C.S. § 9781(b) (providing that review of a challenge to the discretionary aspects of sentencing requires the petitioning party to show a substantial question that the sentence imposed is not appropriate under the Sentencing Code)). Third, Judge Fitzgerald believed that the issue under consideration, involving the imposition of a sentence of life without parole on a juvenile, was "a sufficiently extraordinary legal question to warrant review despite a procedural default." *Id.* at 50.

Judge Fitzgerald would have decided the claim on its merits and, in so doing, would have concluded that the decision to resentence Batts to life without the possibility of parole was unsupported by both the record and the prevailing law. *See id.* at 49–54.

In his view, the sentencing court improperly "framed its choice as two extremes: the Commonwealth's recommendation that [Batts] be sentenced to life without parole, and [Batts'] request for a sentence of twenty-five years to life as suggested by 18 Pa.C.S. § 1102.1." *Id.* at 54 (citing N.T., 5/2/2014, at 56). The sentencing court gave no meaningful consideration to imposing a minimum term of incarceration above the twenty-five-year minimum sentence it rejected. *Id.* Further, according to Judge Fitzgerald, the sentencing court's belief that a sentence less than life without parole would constitute an act of "leniency" represents a misunderstanding of "the nature of our indeterminate sentencing scheme." *Id.*; *see Commonwealth v. Daniel*, 243 A.2d 400, 403 (Pa. 1968) ("the maximum sentence is the real sentence … the only portion of the sentence which has legal validity").

### III. Issues Raised

Batts filed a petition for allowance of appeal to this Court, and we granted his request to answer the following questions:

> 1. In *Miller v. Alabama,* the U.S. Supreme Court outlawed mandatory life without parole for juveniles [], and instructed that the discretionary imposition of this sentence should be "uncommon" and reserved for the "rare juvenile offender whose crime reflects irreparable corruption."
>
>> i. There is currently no procedural mechanism to ensure that juvenile [life without parole] will be "uncommon" in Pennsylvania. Should this Court exercise its authority under the Pennsylvania Constitution to promulgate procedural safeguards including (a) a presumption against juvenile [life without parole]; (b) a requirement for competent expert testimony; and (c) a "beyond a reasonable doubt" standard of proof?
>>
>> ii. The lower court reviewed [Batts'] sentence under the customary abuse of discretion standard. Should the

Court reverse the lower court's application of this highly deferential standard in light of *Miller?*

2. In *Miller,* the U.S. Supreme Court stated that the basis for its individualized sentencing requirement was *Graham*'s comparison of juvenile [life without parole] to the death penalty. [Batts] received objectively less procedural due process than an adult facing capital punishment. Should the Court address the constitutionality of [Batts'] resentencing proceeding?

*Commonwealth v. Batts*, 135 A.3d 176 (Pa. 2016) (per curiam).

## IV. Precedent

Prior to engaging in a discussion of the arguments presented, it is first necessary for us to examine the legal precedent upon which this decision rests.

### A. *Roper v. Simmons*

We begin with the United States Supreme Court's 2005 decision in *Roper v. Simmons*. At the age of seventeen, Christopher Simmons decided he wanted to murder someone by breaking into a house, tying the person up, and throwing the victim off a bridge. He informed his fifteen- and sixteen-year-old friends of his idea, indicating that because they were juveniles, they would "get away with it." *Roper*, 543 U.S. at 556. Following the execution of his plan, Simmons bragged openly about the murder, saying that he had killed the victim "because the bitch seen my face." *Id.* at 557. Following his conviction of murder, Simmons was sentenced to death.

The *Roper* Court observed that the death penalty is reserved for the most culpable offenders who commit the most serious crimes, justifying their execution. *Id.* at 568. The Court found three differences between juveniles and adults that rendered juveniles "categorically less culpable than the average criminal," and precluded a finding that a juvenile can "with reliability be classified among the worst offenders." *Id.* at 567,

568. First, the Court recognized, based on a common-sense understanding of children, as well as scientific and sociological studies, that juveniles are less mature and have a less developed sense of responsibility, which "often result[s] in impetuous and ill-considered actions and decisions." *Id.* at 569 (citations omitted). In that vein, the Court observed that "adolescents are overrepresented statistically in virtually every category of reckless behavior." *Id.* (quoting Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Rev. 339 (1992)). The Court thus found that "[t]he susceptibility of juveniles to immature and irresponsible behaviors means that their irresponsible conduct is not as morally reprehensible as that of an adult." *Id.* at 570 (citation and quotation marks omitted).

Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982), for the proposition that "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage"). The Court stated that according to research, this is largely because juveniles lack the ability or authority to control their environments. *Id.* (citing Steinberg & Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist 1009, 1014 (2003)). Therefore, "[t]heir own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." *Id.* at 570 (citation omitted).

Third, the character and personality of a juvenile are not formed, but are "more transitory, less fixed" than they will be as an adult. *Id.* at 570 (citing E. Erikson, *Identity: Youth and Crisis* (1968)). "The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Id.* The Court found "misguided" any attempt to treat the acts of a juvenile as if they were committed by an adult, as studies support the notion that personality flaws in a juvenile will change over time – "the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Id.* (citing, inter alia, Steinberg & Scott 1014, as stating: "For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood.").

Considering these differences between juveniles and adults, the *Roper* Court concluded that juveniles cannot reliably be counted among the worst offenders. Because of their diminished culpability, the Court found that the penological justifications for the death penalty – deterrence and retribution – necessarily fell away. *See id.* at 571-72. In concluding that there must be a categorical ban on the imposition of the death penalty for juveniles, the Court stated:

> The differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter

> of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death. … It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. *See* Steinberg & Scott 1014-1016.

*Id.* at 572-73. The Supreme Court thus concluded that the death penalty was a disproportionate punishment for juvenile offenders, and therefore, cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

## B. *Graham v. Florida*

In 2010, the United States Supreme Court in *Graham v. Florida* revisited the question of proportionality of sentencing for juvenile offenders, this time as it related to a sentence of life in prison without the possibility of parole for the commission of a non-homicide offense. In that case, Terrence Graham committed an armed burglary and attempted robbery when he was sixteen years old. Charged as an adult, he faced a maximum sentence of life without parole, but received three years of probation pursuant to a plea agreement. Less than six months after he was sentenced, when he was approximately a month shy of his eighteenth birthday, he committed two home invasion robberies. He fled from police, striking a telephone pole with his vehicle. Police apprehended Graham and discovered three handguns in the car.

Following hearings on Graham's violations of probation, the court found Graham in violation based upon his admission that he attempted to avoid arrest, and the court's conclusion that Graham had committed the home invasion robbery, possessed a firearm and associated with individuals engaged in criminal activity. Although the prosecution sought an aggregate sentence of forty-five years of incarceration, and the

presentence investigation report only recommended a sentence of four years of imprisonment, the court sentenced Graham to life in prison without the possibility of parole. The court reasoned, based on Graham's "escalating pattern of criminal conduct," he would continue to engage in criminal behavior, requiring the court to "protect the community" from Graham's actions. *Graham*, 560 U.S. at 57.

Following its grant of certiorari, the United States Supreme Court found that the differences between juveniles and adults observed in *Roper* applied with equal force to the circumstances at issue in *Graham*. The Court identified no basis to reconsider its conclusions in *Roper* about the inherent immaturity and impetuousness of juveniles; to the contrary, "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." *Id.* at 68. Observing that defendants who commit non-homicide offenses are generally less deserving of the most severe punishments than those who commit murder, the Court concluded that "a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability" as compared to an adult murderer. *Id.* at 69.

The Court further recognized that life without parole, the second most severe punishment, shares some unique characteristics with capital punishment, including the irrevocability of the associated forfeiture and the deprivation of liberty without hope for its restoration. Moreover, the *Graham* Court identified life without parole as an even harsher sentence for a juvenile than it is for an adult because "a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." *Id.* at 70. Further, because of the permanence of the punishment and the differentiating characteristics of a juvenile (namely, impetuousness, an underdeveloped

sense of responsibility, lessened culpability, and a greater capacity for change and rehabilitation than adults), the Court concluded that the penological justifications to support the imposition of life without parole sentences for non-homicide crimes committed by juveniles – retribution, deterrence, incapacitation and rehabilitation – were not met. *See id.* at 71-74.

The United States Supreme Court therefore held that the absence of a lawful justification for the sentence, "the limited culpability of juvenile non[-]homicide offenders and the severity of life without parole sentences all lead to the conclusion that the sentencing practice under consideration is cruel and unusual," and forbidden by the Eighth Amendment to the United States Constitution. *Id.* at 74. The Eighth Amendment requires that a sentencing court take into account a defendant's youthfulness at the time he/she committed the offense. *Id.* at 76.

The Court explained that although its holding does not require a State to guarantee a juvenile's release following conviction for a non-homicide offense, a court must provide the defendant with "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75.

> Those who commit truly horrifying crimes as juveniles may turn out to be irretrievable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of non[-]homicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society.

*Id.*

### C. *Miller v. Alabama*

Two years later, in *Miller v. Alabama*, the United States Supreme Court considered the proportionality of life-without-parole sentences for juveniles convicted of homicide offenses. It concurrently considered the cases of two juveniles – Kuntrell Jackson, who at the age of fourteen, participated in a failed armed robbery of a convenience store during which his accomplice shot and killed the store clerk; and Evan Miller, who at the age of fourteen, bludgeoned and intentionally incinerated an adult neighbor, with whom he had been smoking marijuana, after the neighbor caught him stealing money from his wallet. In both cases, the offenses for which they were convicted (capital felony murder for Jackson and murder in the course of arson for Miller), carried a mandatory sentence of life in prison without the possibility of parole.

Relying on the findings it made in *Roper* and *Graham* and the scientific studies upon which they were based, the United States Supreme Court reiterated "that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at 471-72. The Court observed that "none of what it said about children – about their distinctive (and transitory) mental traits and environmental vulnerabilities – is crime-specific." *Id.* at 473. Rather, as in *Roper* and *Graham*, the Court reasoned that "[d]eciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he] is incorrigible' – but 'incorrigibility is inconsistent with youth.'" *Id.* at 472-73 (quoting *Graham*, 560 U.S. at 72).

In contravention of the "foundational principle" set forth in *Roper* and *Graham*, the mandatory sentencing statutes at issue in *Miler* imposed the States' most severe term of imprisonment, treating him as though he was an adult, "removing youth from the

balance" and "prohibit[ing] a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Id.* at 474. Once again likening a life-in-prison sentence for a juvenile to the death penalty, the *Miller* Court concluded that sentencing for juveniles must be individualized. *See id.* at 474-78. This requires consideration of the defendant's age at the time of the offense, as well as "its hallmark features," including:

> immaturity, impetuosity, and failure to appreciate risks and consequences[;] … the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional[;] … the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him[;] … that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys[;] … [and] the possibility of rehabilitation … when the circumstances [(the youthfulness of the offender)] most suggest it.

*Id.* at 477-78. *See also id.* at 476 (stating that in addition to age, a court must also give consideration to a juvenile offender's "background and mental and emotional development … in assessing his culpability") (quoting *Eddings*, 455 U.S. at 116).

The Court thus held that a sentencing scheme that mandates the imposition of a life-without-parole sentence for a juvenile violates the Eighth Amendment to the United States Constitution. "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* at 479. The Court did not foreclose the possibility that a child could be sentenced to life without parole in a homicide case, but emphasized its view that "appropriate occasions for sentencing juveniles to this

harshest possible punishment will be uncommon," especially in light of the difficulty observed in *Roper* and *Graham*, "even for expert psychologists" to "distinguish[] at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" *Id.* at 479-80 (quoting *Roper*, 543 U.S. at 573; *Graham*, 560 U.S. at 73).

In so holding, the Court took pains to differentiate the sentencing considerations required from a court's resolution of a request to transfer a matter to the jurisdiction of the juvenile court. The *Miller* Court observed that the question to be determined at a transfer hearing is markedly different from that posed at a sentencing proceeding:

> Because many juvenile systems require that the offender be released at a particular age or after a certain number of years, transfer decisions often present a choice between extremes: light punishment as a child or standard sentencing as an adult (here, life without parole). … Discretionary sentencing in adult court would provide different options: There, a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term *with* the possibility of parole or a lengthy term of years. It is easy to imagine a judge deciding that a minor deserves a (much) harsher sentence than he would receive in juvenile court, while still not thinking life-without-parole appropriate.

*Id.* at 488-89.

### D.  *Montgomery v. Louisiana*

In January 2016, the United States Supreme Court decided *Montgomery v. Louisiana*, holding that "*Miller* announced a substantive rule that is retroactive in cases on collateral review."[8]  *Montgomery*, 136 S.Ct. at 732.  The defendant in that case,

---

[8]  The decision in *Montgomery* overturned this Court's decision in *Commonwealth v. Cunningham*, 81 A.3d 1 (Pa. 2013), wherein a majority of this Court held, based upon the framework announced in *Teague v. Lane*, 489 U.S. 288 (1989) (plurality), that the (continued…)

Henry Montgomery, was then sixty-nine years old, having spent approximately fifty years in prison on a mandatory term of life for the killing of a Louisiana law enforcement officer when he was seventeen years old. The Court observed (without confirming) that while incarcerated, Montgomery had reportedly transitioned "from a troubled, misguided youth to a model member of the prison community." *Id.* at 736.

In explaining the basis for its decision, the *Montgomery* Court stated that the legal principles established in *Roper* and *Graham*, and applied in *Miller*, regarding the differences between adults and juveniles and a juvenile's resultant "diminished culpability and greater prospects for reform" are generally applicable to all juveniles. *See id.* at 732-33. "[T]he penological justifications for life without parole collapse in light of the 'distinctive attributes of youth.'" *Id.* at 734 (quoting *Miller*, 567 U.S. at 472). The Court clarified that *Miller* requires far more than mere consideration of an offender's age prior to imposing a life-without-parole sentence, as such a sentence "still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'" *Id.* (quoting *Miller*, 567 U.S. at 479). Life without parole "is a disproportionate sentence for all but the rarest of children, those whose crimes reflect irreparable corruption," "permanent incorrigibility," and "such irretrievable depravity that rehabilitation is impossible," thereby excluding "the vast majority of juvenile offenders" from facing a sentence of life in prison without the possibility of parole. *Id.* at 726, 733, 734 (internal quotation marks omitted).

---

(…continued)
pronouncement in *Miller* was procedural, not substantive, in nature, and thus did not apply to judgments that were final at the time of *Miller*. *See Cunningham*, 81 A.3d at 4-11.

"*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id.* at 734. Although the *Montgomery* Court acknowledged that *Miller* contains no "formal factfinding requirement" prior to a sentencing court imposing a sentence of life without the possibility of parole on a juvenile, the Court stated that this omission was purposeful so as to permit the States to sovereignly administer their criminal justice systems and establish a procedure for the proper implementation of *Miller*'s holding. *Id.* at 735. It emphasized, however, that a sentence of life without the possibility of parole imposed upon a juvenile offender is unconstitutional if the crime reflected the juvenile's "transient immaturity." *Id.*

Despite reserving to the States the task of prescribing the procedure for implementing *Miller*, the High Court observed, rather than relitigating the sentence of every affected juvenile, States could simply entitle all juvenile homicide offenders to be eligible for parole. This would "ensure[] that that juveniles whose crimes reflected only transient immaturity – and who have since matured – will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Id.* at 736. Should offenders exhibit an inability to reform, they will "continue to serve their sentences." *Id.*

### V. Batts' Sentence

Turning to the issues raised in this appeal, we begin by addressing Batts' sentencing challenge. He contends that although the sentencing court considered factors relating to his age and development, this was insufficient to satisfy the mandates of *Miller* and *Montgomery*. Because the sentencing court found, based upon expert testimony, that "Batts has demonstrated some capacity for change," and that it was at

least possible that "significant change" could occur with years of therapy, this precluded the institution of a life-without-parole sentence. Batts' Brief at 29-30 (citing, in part, Sentencing Court Opinion, 8/27/2014, at 54, 58-59). Batts emphasizes that the United States Supreme Court did not require a sentencing court to be positive that the defendant is capable of rehabilitation and change; in fact, he asserts, the opposite is true, as the sentencing court must make a finding that the juvenile is irreparably corrupt before a sentence of life without parole can be imposed.

Batts states that his sentence of life without parole is illegal, as the sentencing court's decision violates the dictates of *Miller* and *Montgomery*. He contends that we must employ a de novo standard of appellate review of the sentencing court's legal conclusion regarding his eligibility for a life-without-parole sentence. *Id.* at 29, 40. He further asserts that we should review de novo each of the factors considered by the sentencing court based upon the evidence presented. *See id.* at 41-57.

The Commonwealth and its amicus, the Pennsylvania District Attorneys Association ("DAA"), disagree. They assert that the sentencing court adhered to the remand order, considered all of the required factors, and properly found that Batts was subject to a sentence of life in prison without the possibility of parole. Commonwealth's Brief at 52-53; DAA's Brief at 14-15. They further contend that the propriety of a life-without-parole sentence imposed on a juvenile is not a question of the legality of the sentence, as the sentencing decision rests in the discretion of the sentencing court and therefore, appellate review should be conducted using an abuse of discretion standard.[9]

---

[9] "[A]n abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly (continued…)

Commonwealth's Brief at 39-44; DAA's Brief at 20 (stating that a de novo review is applicable for questions of law, which are not present in appellate review of a life-without-parole sentence imposed upon a juvenile offender).

## A. Level of Scrutiny for Batts' Sentencing Claim

The question of the appropriate level of scrutiny for appellate review of a non-mandatory sentence of life without parole imposed upon a juvenile is an issue of first impression before this Court.[10] For appellate review purposes, challenges to a criminal sentence typically fall into one of two categories, implicating either the legality of the sentence or the discretionary aspects of the sentence. This distinction is critical, as the determination also encompasses matters of issue preservation, this Court's jurisdiction to decide the question presented, and the level of deference the reviewing court must give to the decision of the sentencing court.

A challenge to the legality of a particular sentence may be reviewed by any court on direct appeal; it need not be preserved in the lower courts to be reviewable and may even be raised by an appellate court sua sponte. *Commonwealth v. Barnes*, 151 A.3d 121, 124 (Pa. 2016); *see also Montgomery*, 136 S.Ct. at 731 (stating that because "[a] conviction or sentence imposed in violation of a substantive rule is not just erroneous but contrary to law and, as a result, void[, i]t follows, as a general principle, that a court has no authority to leave in place a conviction or sentence that violates a substantive

---

(…continued)
unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Commonwealth v. Safka*, 141 A.3d 1239, 1249 (Pa. 2016).

[10] This is a question of law, for which our standard of review is de novo. *Commonwealth v. Eisenberg*, 98 A.3d 1268, 1276 (Pa. 2014).

rule") (citing *Ex parte Siebold*, 100 U.S. 371, 376 (1880)). As we have previously explained, our decisions pertaining to questions of sentencing illegality "have not always been smooth," with "complexities" arising "from disagreement among the members of the Court concerning whether a particular claim implicates the legality of a sentence." *Commonwealth v. Spruill*, 80 A.3d 453, 460-61 (Pa. 2013). There is no dispute, however, that a claim challenging a sentencing court's legal authority to impose a particular sentence presents a question of sentencing legality. *See, e.g., Commonwealth v. Vasquez*, 744 A.2d 1280, 1282 (Pa. 2000) (question of "whether the trial court had the authority to impose a statutorily mandated fine" is a challenge to sentencing legality); *Commonwealth v. Shiffler*, 879 A.2d 185, 189 (Pa. 2005) (claim regarding the court's authority to impose a particular sentence implicates the legality of the sentence); *In re M.W.*, 725 A.2d 729, 731 (Pa. 1999) (same).

The United States Supreme Court decisions that control in this matter unambiguously permit the imposition of a life-without-parole sentence upon a juvenile offender **only** if the crime committed is indicative of the offender's permanent incorrigibility; that the crime was not the result of the "unfortunate yet transient immaturity" endemic of all juveniles. *See Montgomery*, 136 S.Ct. at 726, 734; *Miller*, 567 U.S. at 479; *see also Graham*, 560 U.S. at 73; *Roper*, 543 U.S. at 573. Therefore, for a sentence of life without parole to be proportional as applied to a juvenile murderer, the sentencing court must first find, based on competent evidence, that the offender is entirely unable to change. It must find that there is no possibility that the offender could be rehabilitated at any point later in his life, no matter how much time he spends in prison and regardless of the amount of therapeutic interventions he receives, and that

the crime committed reflects the juvenile's true and unchangeable personality and character. *Montgomery*, 136 S.Ct. at 733 (stating that pursuant to *Miller*, life without parole is only justified for "the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible").

Under *Miller* and *Montgomery*, a sentencing court has no discretion to sentence a juvenile offender to life without parole unless it finds that the defendant is one of the "rare" and "uncommon" children possessing the above-stated characteristics, permitting its imposition. *Montgomery*, 136 S.Ct. at 726, 734; *Miller*, 567 U.S. at 479; *see Graham*, 560 U.S. at 73; *Roper*, 543 U.S. at 572-73. A sentence of life in prison without the possibility of parole for a murder committed when the defendant was a juvenile is otherwise disproportionate and unconstitutional under the Eighth Amendment. *Montgomery*, 136 S.Ct. at 734, 735.

Thus, in the absence of the sentencing court reaching a conclusion, supported by competent evidence, that the defendant will forever be incorrigible, without any hope for rehabilitation, a life-without-parole sentence imposed on a juvenile is illegal, as it is beyond the court's power to impose. *See Vasquez*, 744 A.2d at 1282; *Shiffler*, 879 A.2d at 189; *In re M.W.*, 725 A.2d at 731. As stated by the *Montgomery* Court, "when a State enforces a proscription or penalty barred by the Constitution, the resulting conviction or sentence is, by definition, unlawful." *Montgomery*, 136 S.Ct. at 729-30. As such, we must review the sentencing court's legal conclusion that Batts is eligible to receive a sentence of life without parole pursuant to a de novo standard and plenary scope of review. *Commonwealth v. McClintic*, 909 A.2d 1241, 1245 (Pa. 2006). Because this legal conclusion is premised upon the presentation of testimony and the sentencing

court's credibility determinations, it presents a mixed question of fact and law. In such circumstances, we defer to the findings of fact made by the sentencing court as long as they are supported by competent evidence, but give no deference to that court's legal conclusions. *Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 13 (Pa. 2014); *Commonwealth v. James*, 69 A.3d 180, 186 (Pa. 2013); *Commonwealth v. Spotz*, 18 A.3d 244, 259 (Pa. 2011); *In re Condemnation by Urban Redevelopment Auth. of Pittsburgh*, 913 A.2d 178, 183 (Pa. 2006).

## B. The Legality of Batts' Sentence

Here, although the sentencing court recited the words "unfortunate yet transient immaturity" when sentencing Batts, and made a finding that Batts' commission of murder was not the result thereof, *see* Sentencing Court Opinion, 8/27/2014, at 62,[11] the sentencing court also repeatedly made the conflicting finding that there remained a possibility that Batts could be rehabilitated:

- concluding, "based on the experts' opinions, Batts … would need years of therapy to achieve meaningful personality change and rehabilitation" (*id.* at 53);

- classifying Batts' amenability to treatment as "uncertain[]" (*id.* at 58);

- finding that Batts "may ultimately prove to be amenable to treatment" and, according to the expert testimony, "rehabilitation will require years of psychotherapy," which the court found "weighs in favor of an extended period of incarceration" (*id.* at 58-59);

- finding that Batts' horrific childhood experiences "suggest that [he] might benefit from psychotherapy and other forms of rehabilitation" (*id.* at 59);

---

[11] In its written opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the sentencing court quotes extensively from the lengthy and detailed findings it made at the May 2, 2014 sentencing hearing. For the ease of the reader, we cite only to the sentencing court's opinion in our analysis of the arguments raised.

- finding, based on scientific research on the adolescent brain, that Batts' young age at the time of the crimes weighed in favor of his "amenability to treatment and rehabilitation and [his] capacity for change" (*id.*);

- considering Batts' academic history, participation in sports, his vocational and educational pursuits while in prison, the courses in which he has voluntarily participated while in prison, the relationship he has with his family (particularly with his younger brother), and the absence of any criminal history as "factors [that] weigh in favor in assessing [his] capacity for change" (*id.* at 59-60);

- finding, based on expert testimony, that his "young age and the insights [he has] gained into the psychological issues that led [him] to commit [his] crimes," would allow his psychological condition to improve if "given the benefit of years of psychotherapy and other forms of rehabilitation" (*id.* at 60);

- indicating that the expert opinions support the conclusion that he could be rehabilitated with years of therapy (*id.* at 61, 115);

- stating that it was uncertain whether it would ever be safe to release Batts from prison (*id.* at 119);

- stating "the strong need for protection of the public outweighed Batts'[] limited amenability to treatment and potential for rehabilitation" (*id.* at 121).

Our review of the record finds ample positive support relative to Batts' potential for rehabilitation. *See supra*, pp.14-19.

As we read the sentencing court's opinion, it becomes clear that its conclusion that Batts' actions were not the result of his "unfortunate yet transient immaturity" was based exclusively on the fact that the murder was "deliberate and premediated." *See* Sentencing Court Opinion, 8/27/2014, at 59, 62. The sentencing court went on to say, "I'm not suggesting that premeditated murder can never be considered impulsive for purposes of sentencing. There might well be circumstances under which premeditated murder could be the product of poor judgment, lack of foresight, susceptibility to peer pressure and weak impulse control. That is not the case here." *Id.* at 82. And yet, it was the sentencing court's view that because Batts was not "caught up in the heat of a stressful confrontation," without "time to plan and deliberate" or an "appreciation for

what might happen next," there could be no finding that the murder was the result of youthful impulsiveness or poor judgment. *Id.* Given this perspective, the conviction of any juvenile of first-degree murder would require the imposition of a sentence of life without parole, as first-degree murder in Pennsylvania is, by definition "deliberate and premeditated." 18 Pa.C.S. § 2502(a) ("A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.").

The view expressed by the sentencing court contravenes the relevant United States Supreme Court precedent. *Miller* and *Montgomery* directly address the sentencing of juveniles who commit intentional murders. The *Miller* Court emphasized that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at 472. "*Miller*'s central intuition" is "that children who commit even heinous crimes are capable of change." *Montgomery*, 136 S.Ct. at 736; *see also, e.g., Miller*, 567 U.S. at 468 (indicating that Miller, prior to delivering the final blow to his victim's skull, said "I am God, I've come to take your life"). The sentencing court's reasoning impermissibly overrides the United States Supreme Court's repeated admonitions, outlined above, that juvenile first-degree murderers are presumptively less culpable than their adult counterparts and, as such, should be sentenced differently.

Moreover, although there is no question that the sentencing court thoroughly and completely reviewed the record and thoughtfully considered the testimony presented at the resentencing hearing,[12] it overlooked the main premise of the United States

---

[12] The sentencing court issued its findings for its sentencing decision on the record, which span 66 pages of transcript, and further authored a 127-page opinion pursuant to (continued…)

Supreme Court's jurisprudence regarding juvenile sentencing issued over the last twelve years. The High Court has held, as a matter of law, "that children are constitutionally different from adults for purposes of sentencing," in that they "have diminished culpability and greater prospects for reform," making them "less deserving of the most severe punishments." *Miller*, 567 U.S. at 471 (quoting *Graham*, 560 U.S. at 68). This legal conclusion was based on the determination that juveniles (1) lack maturity and have "an underdeveloped sense of responsibility," which results in reckless, impulsive and unnecessary risk-taking behaviors; (2) are highly vulnerable to peer pressure and negative influence resulting from their inability to control their environments; and (3) have characters and personalities that are not fully formed or fixed, and struggle to figure out their identities. *Id.* (citing *Roper*, 543 U.S. at 569-70).

Without providing any basis to differentiate Batts' decision making from the typical teenager contemplated in *Roper*, *Graham* and *Miller*, the sentencing court found that Batts, at the age of fourteen, "made a purposeful choice to move out of his parents' home" and to join a gang, with knowledge that it "was a violent criminal organization and that he would be asked to commit violent criminal acts." Sentencing Court Opinion, 8/27/2014, at 49-50. The court further found that although Batts was subjected to peer pressure at the time of the murder, the "peer pressure was not imposed upon [] Batts"; instead he "sought out and embraced gang membership," and therefore, this peer

(…continued)
Pa.R.A.P. 1925(a) thoroughly detailing what it considered when sentencing Batts in response to the issues raised on appeal before the Superior Court. In both instances, the sentencing court included specifics about Batts' childhood, academics, athletics, and provided a detailed account of the testimony received from both parties at the resentencing hearing.

pressure did not diminish his culpability. *Id.* at 50-51. These findings contravene the Supreme Court's unambiguous instruction not to treat juveniles as "miniature adults," proceeding as though they not children. *See Miller*, 567 U.S. at 481. They ignore the principal tenet of *Roper*, *Graham*, *Miller* and *Montgomery*, and the scientific studies regarding juvenile brain development that the Court adopted and upon which it relied. *See id.* at 474, 477-78, 481.

The sole evidentiary support for the sentencing court's conclusions in this regard was the testimony and report of the Commonwealth's expert, Dr. Michals. It was Dr. Michals' opinion that Batts made a "purposeful decision" and "deliberate choice" to commit these crimes. N.T., 5/1/2014, at 51, 53. Dr. Michals, however, provided no basis for his conclusion that Batts had the ability to make sound, reasoned decisions at the age of fourteen – a skill the Supreme Court determined is generally eclipsed by a juvenile's impetuousness and immaturity. In fact, Dr. Michals was not only of the opinion that Batts' personality was likely fully formed and fixed at the age of fourteen, but that personalities of people in general are not subject to change. Specifically, Dr. Michals testified, "Characteristics can change but it's very difficult to make changes to the basic structure of our personality." *Id.* at 59. Though he acknowledged that he "can't predict the future," he was of the opinion that the personality of "somebody who is 14" likely will not change over time. *Id.* He went on to say that "it's difficult to change our underlying personality traits," and in his opinion, this "applies to everybody." *Id.* at 60; *see also id.* at 51 (Dr. Michals opining that "we are who we are as a result of biological genetic makeup and merely [sic] life experiences … the personality is or character is a definition of ourselves."). Indeed, despite the Supreme Court's

conclusion to the contrary, Dr. Michals maintained that "research dealing with adolescent behavioral and brain development" is inconclusive, with "research findings … still in progress." Dr. Michals' Report, 3/12/2014, at 19; *but see Miller*, 567 U.S. at 472 n.5 ("The evidence presented to us in these cases indicates that the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger.").

The testimony and conclusions espoused by Dr. Michals are in direct opposition to the legal conclusion announced by the High Court and the facts (scientific studies) underlying it. Dr. Michals' testimony therefore does not constitute competent evidence and cannot provide support for a conclusion that Batts' actions were not the result of transient immaturity or that he is permanently incorrigible. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996) (stating that when the United States Supreme Court issues a decision, courts are bound "not only [by] the result[,] but also those portions of the opinion necessary to that result"); *Commonwealth v. Jemison*, 98 A.3d 1254, 1257 (Pa. 2014) ("Pursuant to the Supremacy Clause of the United States Constitution … this Court, like all state courts, is bound by decisions of the U.S. Supreme Court with respect to the federal Constitution and federal substantive law."). Moreover, the numerous findings chronicled earlier in the Opinion accepting the possibility of Batts' potential rehabilitation indicate that the sentencing court did not fully embrace Dr. Michals' opinion.

Based on our review of the sentencing court's findings and the bases therefor, we conclude that a sentence of life in prison without the possibility of parole for Batts is disproportionate under *Miller* and *Montgomery* and thus violates the Eighth Amendment

to the United States Constitution. Our decision here should not be interpreted as depreciating the seriousness of the reprehensible crimes Batts committed. His senseless and needless acts of violence left one teenager dead and another seriously injured, and the victims' families are living with the consequences. There is no question that Batts, as a fourteen-year-old murderer, must be held accountable and serve a sentence commensurate with those acts. Pursuant to the evidence presented before the sentencing court, the findings of the sentencing court regarding the possibility of rehabilitation, and the clear Supreme Court precedent that controls in this matter, however, upon resentencing Batts, the court "must provide [Batts] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 74).

## VI. Validity of *Batts I*

As previously discussed, in *Batts I,* this Court determined that for juveniles convicted prior to *Miller* for whom a sentence of life without parole was unconstitutional, the prohibition against paroling inmates sentenced to serve life in prison could be severed from section 6137(a) of the Parole Code. Thus, a court may sentence affected defendants to a minimum term-of-years sentence and a maximum sentence of life in prison, exposing these defendants to parole eligibility upon the expiration of their minimum sentences. *See* 61 Pa.C.S. § 6137(a)(3).

In the context of a challenge to the legality of the sentencing decision announced in *Batts I* and in light of intervening decisions from this Court, Batts urges us to reconsider the argument we previously rejected – that Pennsylvania's first-degree murder sentencing scheme is unconstitutional and therefore, he must be sentenced as

if he were convicted of third-degree murder as a lesser included offense instead. Batts' Brief at 62. "Rather than repeat the arguments presented" in the amicus brief that had already been filed in this Court by the Pennsylvania Association of Criminal Defense Lawyers ("PACDL"), Batts adopts its argument in support of the claim. *Id.*

PACDL frames this issue as a "non-waivable question concerning the legality of the sentence," as Batts was resentenced pursuant to *Batts I,* which, it contends, announced an impermissible sentencing construct. PACDL's Brief at 2. In PACDL's view, this Court's resolution of this issue in *Batts I* (excising the unconstitutional part of section 6137(a)(1) prohibiting parole in the case of first-degree murder committed by a juvenile from the remainder of the parole statute) constitutes an impermissible use of our severance authority. This is because, according to PACDL, the remaining portion of the statute is "'incomplete' or 'incapable of being executed,'" because of another statutory requirement that a term of years sentence have a minimum sentence that is not greater than half of the maximum sentence – a mathematical impossibility when the maximum term of incarceration is life. *Id.* at 10-11; *see* 42 Pa.C.S. § 9756(b)(1) (requiring that a minimum term of imprisonment "shall not exceed one-half of the maximum sentence imposed").

Severance also fails, according to PACDL, because the General Assembly excluded pre-*Miller* convictions from the sentencing scheme announced in section 1102.1, and we therefore cannot presume the General Assembly would have enacted the remaining portions of section 6137(a) without the limitation on the ability to parole a juvenile sentenced to life in prison. PACDL's Brief at 11. As there is no legislatively authorized sentence for juveniles convicted of first-degree murder, Batts could not be

sentenced for the crime of first-degree murder. *Id.* at 12-13 (citing Characteristics of the Substantive Criminal Law, 1 Subst. Crim. L. § 1.2 (2d ed.) ("[A] crime is made up of two parts, forbidden conduct and a prescribed penalty. The former without the latter is no crime.")). Further, as confirmed in this Court's recent decisions in *Commonwealth v. Hopkins*, 117 A.3d 247 (Pa. 2015), and *Commonwealth v. Wolfe*, 140 A.3d 651 (Pa. 2016), it is impermissible for the judiciary to "rewrite" a sentencing statute to make it conform to the constitutional commands of a United States Supreme Court decision. PACDL's Brief at 13-14 (citing *Hopkins*, 117 A.3d at 261, 262; *Wolfe*, 140 A.3d at 662).

Because there is no lawful penalty for a juvenile convicted of first-degree murder, PACDL asserts that Batts' current sentence is illegal, and he must be resentenced on the charge of third-degree murder, which carries a maximum penalty of forty years of incarceration.[13] *Id.* at 15-16; 18 Pa.C.S. § 1102(d). In support of this contention, PACDL relies upon the same case law that Batts presented in his supplemental brief to this Court in *Batts I*. *See* PACDL's Brief at 15 (citing *Rutledge v. United States*, 517 U.S. 292 (1996); *Commonwealth v. Story*, 440 A.2d 488 (Pa. 1981); *Commonwealth v. Bradley*, 295 A.2d 842 (Pa. 1972)).

PACDL concludes its argument by contending that following the decision in *Montgomery*, *Batts I* cannot stand because the Court failed to ensure that a sentence of life without parole was "reserved for highly unusual cases," "demonstrated quite

---

[13] The Commonwealth sought leave to file a post-submission communication pursuant to Pa.R.A.P. 2501(a) in the form of a brief filed by the Philadelphia Office of the District Attorney before the Philadelphia County Court of Common Pleas which, inter alia, addressed this argument. It contains no new authority or any arguments that could not have been raised in the Commonwealth's original responsive brief filed in this matter. We therefore deny this request.

dramatically in the resentencing of Mr. Batts himself." *Id.* at 17-18. Further, as argued throughout its amicus brief, "the reasoning and holding" of *Batts I* "were clearly erroneous under prior and subsequent decisions" regarding severance of unconstitutional portions of statutes. *Id.* at 18-19.

The Commonwealth, on the other hand, asserts that our disposition in *Batts I* was correct and should not be revisited. Commonwealth's Brief at 59. Further, because Batts did not seek allowance of appeal for this Court to address this claim, it is not appropriate for this Court to consider the question. *Id.* (citing Pa.R.A.P. 1115(a)(3); *Commonwealth v. Barnes*, 924 A.2d 1202, 1203 (Pa. 2007)).

While it is true that Batts did not request that this Court address this precise issue in his petition for allowance of appeal, Batts and PACDL assert that the sentencing protocol announced in *Batts I* is statutorily incapable of execution, there is no lawful punishment for a juvenile convicted of first-degree murder prior to the date of the *Miller* decision, and that his sentence for anything other than third-degree murder is illegal. *See Commonwealth ex rel. Varronne v. Cunningham*, 73 A.2d 705, 706 (Pa. 1950) (indicating that without a penalty for conduct that is proscribed by the General Assembly there is no crime); *see also* Characteristics of the Substantive Criminal Law, 1 Subst. Crim. L. § 1.2(d) (2d ed.). The argument implicates the legality of his sentence, and therefore is not subject to waiver. *Barnes*, 151 A.3d at 124; *Commonwealth v. Dickson*, 918 A.2d 95, 99 (Pa. 2007). Moreover, as noted, Batts and PACDL argue against the legality of the sentence based, in part, upon decisions of this Court rendered after our

decision in *Batts I*. Thus, we believe that our conclusion on the legality of sentencing issue in *Batts I* warrants further development.[14]

## A. Severance

It is the law of this Commonwealth that every provision of every statute is presumed to be severable. 1 Pa.C.S. § 1925. If a provision of a statute is invalidated for any reason, or as applied to any situation or person, a court must sever it from the remaining, valid portion of the statute unless (1) the remaining valid provisions depend on and "are so essentially and inseparably connected with" the voided provision that the court could not presume that the General Assembly would have enacted the valid portion of the statute without the now-voided portion, or (2) the remaining portions of the statute "are incomplete and are incapable of being executed in accordance with legislative intent." *Id.*; *Robinson Twp. v. Commonwealth*, 147 A.3d 536, 558-59 (Pa. 2016).

The relevant provisions of section 6137 state:

> The [parole] board may parole subject to consideration of guidelines established under 42 Pa.C.S. § 2154.5 (relating to adoption of guidelines for parole) and may release on parole any inmate to whom the power to parole is granted to the board by this chapter, **except an inmate** condemned to death or **serving life imprisonment**, whenever in its opinion:
>
> (i) The best interests of the inmate justify or require that the inmate be paroled.

---

[14] Moreover, since we granted allowance of appeal, in part, to fashion an appropriate procedure to sentence juveniles convicted of first-degree murder, *see Batts*, 135 A.3d 176, at ¶ 1(i), the validity and legality of our decision in *Batts I* is fairly encompassed by this question. It is thus properly before this Court for review. Pa.R.A.P. 1115(a)(3) ("Only the questions set forth in the petition, or fairly comprised therein, will ordinarily be considered by the court in the event an appeal is allowed").

> > (ii) It does not appear that the interests of the Commonwealth will be injured by the inmate's parole.

61 Pa.C.S. § 6137(a)(1) (emphasis added).

There is no argument raised, and we can perceive of no reason to conclude, that the prohibition against paroling an individual condemned to serve life in prison is inseparable from or essential to the remainder of the parole statute. Rather, as stated above, the argument presented by Batts and PACDL is that without this prohibition, the parole statute does not operate as intended by the General Assembly.

The presumption of severability pursuant to section 1925 finds its roots in the Court's longstanding "duty to declare a statute constitutional if this can reasonably be done." *Triumph Hosiery Mills, Inc. v. Commonwealth*, 364 A.2d 919, 921 (Pa. 1976) (quoting *Commonwealth v. Girard Life Insurance Co.*, 158 A. 262, 264 (Pa. 1932)). We must also presume that the General Assembly carefully chose to include every provision of every statute it enacts. *See* 1 Pa.C.S. § 1921(a). As such, in recognition of the requirement to salvage as much of a statute as is constitutionally possible, upon finding a portion of a statute is unconstitutional, the "touchstone" for our determination of legislative intent is to answer the question of "whether the [L]egislature would have preferred what is left of its statute to no statute at all." *D.P. v. G.J.P.*, 146 A.3d 204, 216 (Pa. 2016) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006)).

PACDL challenges the sentencing protocol announced in *Batts I* based on its conclusion that fashioning a legal sentence is impossible in light of section 9756(b)(1), which provides: "The court shall impose a minimum sentence of confinement which

shall not exceed one-half of the maximum sentence imposed." 42 Pa.C.S. § 9756(b)(1). PACDL is correct that there is no way to accurately calculate half of a life sentence. This does not, however, render *Batts I*'s severance of section 6137(a) impermissible, as PACDL baldly claims.

The interplay between section 6137(a) and section 9756(b)(1) was not raised by the parties nor addressed in *Batts I*. However, our holding implicitly required severance of section 9756(b)(1)'s requirement that a minimum sentence can be no more than half of the maximum sentence for juveniles convicted of first-degree murder prior to *Miller*. *See Batts I,* 66 A.3d at 297 (concluding that a juvenile convicted of first-degree murder prior to *Miller* faced "a mandatory maximum sentence of life imprisonment as required by [s]ection 1102(a), accompanied by a minimum sentence determined by the common pleas court upon resentencing," and that this sentencing scheme is "in accord with the dictates of the Eighth Amendment as set forth in *Miller*, as well as the Pennsylvania Legislature's intent as reflected in the relevant statutory provisions"). The necessity of this additional severance to save the sentencing scheme for juveniles convicted of first-degree murder prior to *Miller* does not create an impermissible obstacle since, as stated above, "[t]he provisions of **every statute** [are] severable." 1 Pa.C.S. § 1925 (emphasis added); *see also, e.g., Commonwealth v. Williams*, 832 A.2d 962, 986 (Pa. 2003).

Removing section 9756(b)(1)'s mandate does nothing more than eliminate the ceiling for the minimum term of imprisonment a juvenile sentenced to life with parole may receive.[15] This aligns with the current expression of legislative intent for the

---

[15] This is not the first time this Court has severed the minimum sentence ceiling from section 9756(b)(1) in a given sentencing context. In *Commonwealth v. Ramos*, 83 A.3d (continued…)

sentencing of juveniles convicted of first-degree murder. Section 1102.1(a) requires the imposition of a mandatory minimum sentence for juveniles convicted of first-degree murder. Subsection (e) makes clear that this is only the minimum sentence required, stating, "Nothing under this section shall prevent the sentencing court from imposing a minimum sentence greater than that provided in this section." 18 Pa.C.S. § 1102.1(e). In determining the minimum sentence for a juvenile convicted of first-degree murder prior to *Miller*, a sentencing court is to exercise its discretion to find the appropriate, individualized sentence in each case, just as it would when fashioning the minimum sentence for any other defendant before it.[16] *See Commonwealth v. Gordon*, 942 A.2d 174, 182 (Pa. 2007) ("Pennsylvania judges retain broad discretion to sentence up to and including the maximum sentence authorized by statute; the only line that a sentence may not cross is the statutory maximum sentence."); *Commonwealth v. Walls*, 926 A.2d 957, 966-67 (Pa. 2007) (stating that sentencing in Pennsylvania is individualized, requiring the sentencing court to consider certain factors and to provide an explanation of its reasoning prior to imposing a given sentence).

Further, we reiterate the conclusion we reached in *Batts I*: we have found no support for the proposition that juveniles convicted of first-degree murder pre-*Miller*

---

(…continued)
86 (Pa. 2013), we held that the then-valid mandatory minimum sentence under 42 Pa.C.S. § 9712.1(a) of five years of imprisonment was not illegal despite the fact that the maximum allowable sentence for the crime in question was also five years, rendering section 9756(b)(1) inapplicable. *Ramos*, 83 A.3d at 94.

[16] As we explain in greater detail later in this Opinion, we instruct sentencing courts to look to the mandatory minimum sentences set forth in section 1102.1(a) for guidance in setting a minimum sentence for a juvenile convicted of first-degree murder prior to *Miller*. *See infra*, pp. 80-83.

should be sentenced as though they were convicted of third-degree murder. In support of its position, PACDL relies upon the same case law that we found to be inapplicable in *Batts I. See Batts I,* 66 A.3d at 296. In recognition of our rejection of this case law, PACDL suggests that although we found the cases to be distinguishable, the Court failed to "identify how, in principle, the lawful manner of resolution of the cases would be different," stating its belief that "there is none." PACDL's Brief at 16 n.9. This contention is meritless.

In *Batts I,* we differentiated *Commonwealth v. Story*, which involved a defendant convicted of first-degree murder and sentenced to death pursuant to an unconstitutional statute. The *Story* Court thus vacated the sentence and remanded the case for the imposition of the other legislatively authorized penalty for first-degree murder, life in prison without parole. *Story*, 440 A.2d at 490; *see also Bradley*, 295 A.2d at 845 (holding the same). As the *Batts I* Court explained, this line of cases is inapt. In *Story* and *Bradley*, there existed another sanctioned sentence for first-degree murder. The sentence for third-degree murder advanced by PACDL, however, is not a legislatively sanctioned punishment for a conviction of first-degree murder. *Batts I,* 66 A.3d at 296.

*Batts I* likewise distinguished *Rutledge v. United States*, which involved a defendant who had been convicted and sentenced for two crimes, one of which was a lesser included offense of the other. The United States Supreme Court found this to be impermissible, as it punished the defendant twice for the same conduct. *Rutledge*, 517 U.S. at 300. The *Rutledge* Court dismissed the argument that multiple punishments for greater- and lesser-included offenses were permissible because it provided "a backup conviction" in the event the defendant successfully challenged the conviction of the

greater offense on appeal. The Court observed that "federal appellate courts appear to have uniformly concluded that they may direct the entry of judgment for a lesser included offense when a conviction for a greater offense is reversed on grounds that affect only the greater offense," a practice the High Court had previously noted with approval. *Id.* at 305-06. The *Batts I* Court found this case law to be inapposite, as the case at bar did not involve the vacatur of Batts' first-degree murder conviction, but the determination of "an appropriate scheme for resentencing for that offense, consistent with *Miller.*" *Batts I,* 66 A.3d at 296-97. Moreover, this Court has expressly "rejected the notion that an appellate court may refashion the conviction of a jury into one based on a lesser-included offense," rendering any reliance on *Rutledge* for this proposition to be error. *Commonwealth v. Slaughter*, 583 A.2d 427, 428 (Pa. 1990) (citing *Commonwealth v. Wagner*, 406 A.2d 1026 (Pa. 1979)).

Therefore, if we cannot sever the parole prohibition in section 6137(a)(1) and the requirement that minimum sentences be no greater than half of the maximum term of imprisonment in section 9756(b)(1), the only remaining option would be to release each of the hundreds of juveniles convicted of first-degree murder and sentenced to life without parole prior to *Miller*, *see Varronne*, 73 A.2d at 706 – a result even Batts and PACDL do not contend is correct. *See* PACDL's Brief at 16. Such an extreme measure is unnecessary here because severance of the offending statutory provisions is permissible and aligns with the intent of the General Assembly.

The sentencing scheme at issue before the *Batts I* Court was one of general applicability and was not created specifically to foreclose juveniles sentenced to life in prison from being released on parole. Juveniles are exposed to this sentence only as a

result of the convergence of three statutory provisions – section 6302 of the Juvenile Act, section 1102(a) of the Crimes Code and section 6137(a)(1) of the Parole Code. As explained in *Miller*, these circumstances do not provide an indication that a legislature "endorsed a given penalty for children," and are not conclusive as to whether the General Assembly "actually intended to subject such offenders to those sentences," given that it did not reach this decision "through deliberate, express, and full legislative consideration." *Miller*, 567 U.S. 485-86 (quoting *Graham*, 560 U.S. at 67).

Furthermore, although the General Assembly presumably initially believed (as did a majority of this Court) that the holding in *Miller* would not apply to defendants convicted prior to the date of the decision, this proved to be incorrect in light of the United States Supreme Court's decision in *Montgomery*. Nonetheless, section 1102.1 provides a clear expression of legislative intent as it relates to sentencing juveniles convicted of first-degree murder. Although the statute itself is inapplicable to Batts based (solely) upon the date of his conviction, it is clear, as reflected in section 1102.1, that the General Assembly would preserve the remainder of the parole statute, sever the minimum sentence ceiling of section 9756(b)(1), and permit these defendants to be sentenced to life with the possibility of parole, rather than have no sentence at all for juveniles convicted of first-degree murder. *See D.P.*, 146 A.3d at 216; 18 Pa.C.S. § 1102.1(a). To conclude otherwise would require that we impermissibly presume that the General Assembly intended to discriminate unconstitutionally between pre- and post-*Miller* juvenile offenders or that it intended that only post-*Miller* juvenile offenders receive punishment for first-degree murder – clearly an absurd and unreasonable proposition. *See* 1 Pa.C.S. § 1922(1), (3) (instructing that when ascertaining legislative

intent, courts must presume that the General Assembly did not intend to violate the State or Federal Constitution or intend an absurd, impossible or unreasonable result).

Despite the passage of four years since we issued our decision in *Batts I,* the General Assembly has not passed a statute addressing the sentencing of juveniles convicted of first-degree murder pre-*Miller*, nor has it amended the pertinent provisions that were severed in *Batts I*.[17] *See generally* 42 Pa.C.S. § 9756; 61 Pa.C.S. § 6137. As we have previously stated, "the General Assembly is quite able to address what it believes is a judicial misinterpretation of a statute," and its failure to do so in the years following the *Batts I* decision gives rise to the presumption that the General Assembly is in agreement with our interpretation. *Hunt v. Pennsylvania State Police of the Commonwealth*, 983 A.2d 627, 637 (Pa. 2009).

---

[17] We note that there are currently two proposed drafts of statutes in our Legislature – one from the House and one from the Senate – pertaining to sentencing of juveniles convicted of first-degree murder that were presented for consideration in 2016. These pieces of proposed legislation go even further than *Batts I* to enhance the authority of the parole board to parole inmates convicted of first-degree murder. House Bill 2135, in relevant part, amends section 1102.1 of the Crimes Code to completely remove the authority of the sentencing court to sentence a juvenile to life without the possibility of parole. H.B. 2135, Printer's No. 3484, 200th Gen. Assemb., Reg. Sess. (Pa. 2016). It further amends section 6137 of the Parole Code, striking the prohibition against paroling an individual serving life in prison, making all inmates (juveniles and adults) sentenced to life in prison parole-eligible after fifteen years. *Id.* The bill was referred to the House Judiciary Committee on June 9, 2016, where it remained at the time of this writing.

Senate Bill 1147 eliminates the date of conviction requirement from section 1102.1 and abolishes the authority to sentence a juvenile to life in prison, either with or without parole. S.B. 1147, Printer's No. 1576, 200th Gen. Assemb., Reg. Sess. (Pa. 2016). Instead, a juvenile convicted of first-degree murder committed when he or she was under fifteen would receive a maximum sentence of thirty-five years of imprisonment; a first-degree murder committed by a juvenile aged fifteen to eighteen would require a maximum sentence of forty-five years of imprisonment. *Id.* On March 4, 2016, this bill was referred to the Senate Judiciary Committee, where it too remained at the time of this writing.

## B.  *Hopkins* and *Wolfe*

Our intervening decisions in *Hopkins* and *Wolfe* do not affect our decision in *Batts I*.  In *Hopkins*, we found that section 6317 of the Crimes Code – which imposed a mandatory minimum sentence of imprisonment for possession with intent to deliver or delivery of a controlled substance that occurred within 1000 feet of a school – was unconstitutional.  Specifically, the statute required a judge (not a jury) to find the facts required to impose the mandatory minimum sentence by a preponderance of the evidence (not beyond a reasonable doubt) at sentencing (not at trial); stated that the requisite facts were not an element of the crime; and required no notice to the defendant of the applicability of the statute prior to trial, all of which contravened the United States Supreme Court's holding in *Alleyne v. United States*, 133 S.Ct. 2151 (2013).  *See Hopkins*, 117 A.3d at 249-57.

We further found that we were unable to sever the unconstitutional portions of section 6317 because the remaining, valid portions of the statute could not survive without the voided ones unless this Court added new terms to the statute.  The *Hopkins* Court concluded that this would amount to a wholesale reconceptualization of the statute in a manner that was inconsistent with the explicit statements of legislative intent appearing throughout the statute.  To save the valid provisions of section 6317, this Court would have had to create a substantive offense in place of the existing sentencing statute created and expressly intended by the General Assembly.  *Id.* at 262, 263 n.6. We therefore concluded, "By operation of *Alleyne*, [s]ection 6317 has been stripped of all the features that allow it to function as a sentencing statute."  *Id.* at 259.

In *Wolfe*, we reaffirmed our decision in *Hopkins* as it related to another, similarly worded mandatory minimum sentencing statute, 42 Pa.C.S. § 9718. *Wolfe*, 140 A.3d 660-61. Once again, because severance of the unconstitutional language would have required the Court "to create new aggravated crimes," in direct contravention of the express statements of legislative intent provided in the statute, we concluded that the severance was not possible, as saving any part of the statute would have required the Court to venture "beyond our constitutionally prescribed authority and purview." *Id.* at 662-63.

Severance in *Hopkins* and *Wolfe* required this Court to go far beyond simply striking unconstitutional language from a statute, as our role traditionally requires and permits, and to instead conduct a wholesale rewrite and reconfiguration of a statute, a role exclusively performed by the General Assembly. *See* Pa. Const. art II, § 1. Conversely, *Batts I* did not create a crime or a sentence that did not otherwise exist at the time of our decision, but instead lawfully and appropriately utilized our severance authority in a manner consistent with legislative intent.

This conclusion is supported by the analogous case of *Commonwealth v. Butler*, 328 A.2d 851 (Pa. 1974), wherein this Court applied an existing sentencing construct to a class of individuals that had been expressly excluded from its applicability following the Court's severance of unconstitutional language from the previously applicable statute. In *Butler*, a man brought a challenge under the Equal Rights Amendment[18] to statutory language that required men to receive both minimum and maximum terms of

---

[18] "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." Pa. Const. art. I, § 28.

imprisonment, but permitted women only to receive a maximum sentence and prohibited courts from giving a woman a minimum term of confinement. *Id.* at 854. This discrepancy in language made women immediately parole-eligible upon entering prison, but required men to await the expiration of their minimum sentences before being able to be considered for parole. Because "[t]he statutory scheme on its face treats men less favorably than women," without a basis or justification, we found it to be unconstitutional. *Id.* at 857-58.

It was clearly the intent of the General Assembly, when it enacted the offending statute, to exclude women from the general requirement that sentences of confinement have both minimum and maximum terms. Because of intervening developments in the law, however, that was no longer constitutionally permissible. Given the choice of striking the minimum/maximum statute applicable to men or striking the portion of the statute that excepted women from receiving minimum sentences, the Court found that it was more consistent with the intent of the General Assembly to strike the latter, thus making women subject to minimum terms of imprisonment. The Court reasoned that striking the general minimum/maximum requirement would leave men without any sentence, whereas simply striking the language excluding women from its applicability maintained lawful sentences for both men and women while also addressing the constitutional problem. Further, the Court found that "special sentencing statutes for women … were departures from a more general intent to provide equal sentencing treatment for men and women." *Id.* at 859. The *Butler* Court therefore severed the unconstitutional language, thus requiring the imposition of minimum prison sentences for women.

Likewise, in *Batts I,* through our legislatively-mandated severance power, we struck unconstitutional statutory language and expanded the application of an existing, statutorily provided sentence – life with the possibility of parole – to reach a subset of individuals who could no longer constitutionally be sentenced in accordance with a prior sentencing scheme. Although the General Assembly instituted a blanket prohibition against paroling an individual convicted of first-degree murder, which would necessarily include juveniles, as in *Butler*, this too constituted a departure from the "more general intent" of the General Assembly, which otherwise treated children different from adults for sentencing purposes, *see generally, e.g.,* 42 Pa.C.S. §§ 6301-6375 (the Juvenile Act), and which treatment continues in recent years. *See, e.g.,* 18 Pa.C.S. § 1102.1; *supra* note 17. Thus, the severance decision in *Batts I* stands.

## VII. Procedure for Sentencing Juveniles Convicted of First-Degree Murder

To ensure that a life-without-parole sentence is imposed only on the rarest of juvenile offenders, as required by *Montgomery*, and that the sentencing court does not overly emphasize the nature of the crime in question, Batts and several of his amici[19] request that this Court establish guidelines and procedures for the sentencing (and resentencing) of juveniles convicted of first-degree murder. They argue that *Miller*, as clarified by *Montgomery*, requires the institution of a presumption against sentencing a juvenile offender to life in prison without the possibility of parole. Batts' Brief at 21-22; Advocacy Amici's Brief at 6-7; PBA's Brief at 4-6. Batts asserts that the burden of proving that a juvenile may be subjected to life without parole must be placed on the

---

[19] These amici include the Pennsylvania Bar Association ("PBA"), the Incarcerated Children's Advocacy Network and the Youth Sentencing & Reentry Project (collectively, "Advocacy Amici").

Commonwealth to establish, beyond a reasonable doubt, that the crime reflects that the juvenile is "irreparably corrupt," "irretrievably depraved," and "permanently incorrigible," and must be supported by expert testimony. Batts' Brief at 25-28, 38-39; *see also* PBA's Brief at 7-9. Batts identifies Supreme Court decisions from several other jurisdictions that have held similarly or have gone further, banning life without parole sentences in their entirety for juvenile offenders. *See* Batts' Brief at 22-27.

It is also Batts' position that juveniles facing life in prison without the possibility of parole are entitled to a jury determination "that a juvenile is permanently incorrigible or irreparably corrupt" before the sentence may be constitutionally imposed. *Id.* at 58. In support of this contention he relies upon the United States Supreme Court's decision in *Alleyne*, as well as the *Graham* and *Miller* Courts' comparison of adults facing capital punishment to juveniles facing life in prison without parole. *Id.* at 57-58. In apparent reliance on this latter parallel, Batts asserts that he is "entitled to at least the same procedural due process afforded an adult facing capital punishment under the Eighth Amendment [to the United States Constitution] and Article I, Section 13 of the Pennsylvania Constitution." *Id.* at 58. He thus contends that pursuant to section 9711 of the Sentencing Code (addressing the procedure for capital sentencing), if the Commonwealth states its intention to seek a sentence of life without parole for a juvenile offender, the sentencing proceeding must involve a jury trial, at which the Commonwealth bears the burden of proof. Additionally, under this construct, Batts contends that a unanimous verdict in favor of sentencing the defendant to life without parole is required, with the verdict subjected to automatic appellate review by the Pennsylvania Supreme Court. *Id.* at 60-61.

The Commonwealth and the DAA counter that it would be inappropriate for this Court to announce procedures for sentencing juveniles convicted of first-degree murder, contending that this "is inherently a legislative matter," as it is for the General Assembly to create punishments for criminal acts. Commonwealth's Brief at 23-28 (citing principally *Commonwealth v. DeHart*, 516 A.2d 656 (Pa. 1986)); *see also* DAA's Brief at 13, 18-19 (same). They recognize that this Court previously invoked our rulemaking power in *Commonwealth v. Sanchez*, 36 A.3d 24 (Pa. 2011), to create procedures for determining whether a defendant convicted of first-degree murder is immune from the death penalty pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that the Eighth Amendment prohibits the execution of intellectually disabled[20] persons). The Commonwealth and the DAA differentiate our actions there, however, based upon the length of time that passed between the *Atkins* decision and our decision in *Sanchez*, and the General Assembly's intervening failure to act. Here, they contend, the General Assembly promptly acted following *Miller* by enacting section 1102.1, thus obviating this Court's ability to exercise its rulemaking authority. *See* Commonwealth's Brief at 26-27; DAA's Brief at 13-14, 16 (cautioning this Court not to "preempt the General Assembly for the sake of an unfounded assumption that sentencing courts cannot understand and apply *Miller* and *Montgomery*").

---

[20] "Intellectually disabled" connotes the condition that the United States Supreme Court previously referred to as "mentally retarded." *Compare generally Atkins v. Virginia*, 536 U.S. 302 (2002), *with Moore v. Texas*, 137 S.Ct. 1039 (2017); *see also Commonwealth v. Hannibal*, 156 A.3d 197, 224 (Pa. 2016) (relying on *Hall v. Florida*, 134 S.Ct. 1986, 1990 (2014), for the proposition that "intellectual disability" should be used in place of "mental retardation"). "Intellectual disability" also replaced "mental retardation" in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013).

The Commonwealth asserts that even if Court-created procedures were appropriate in this context, the procedural protections advanced by Batts – a presumption against a life-without-parole sentence for juvenile offenders; placing the burden on the Commonwealth to prove its applicability beyond a reasonable doubt; expert testimony in support of its applicability; and particularized findings of fact – are not required by either *Miller* or *Montgomery*. *See* Commonwealth's Brief at 28-38; DAA's Brief at 14, 20-23. The Commonwealth identifies decisions from several intermediate appellate courts from other jurisdictions that have held similarly. *See* Commonwealth's Brief at 30, 35-38.

The Commonwealth additionally argues that there is no support for a jury determination of a juvenile's susceptibility to a life-without-parole sentence. This is evidenced, per the Commonwealth's argument, by both section 1102.1, which is a legislative pronouncement that requires a judge, not a jury, to determine whether a juvenile may be subjected to life in prison without parole, and the absence of any authority from the Pennsylvania courts or the United States Supreme Court for such a mandate. *Id.* at 46-47, 48-49, 51-52. The DAA asserts that the United States Supreme Court has implicitly held that death penalty standards are inapplicable in these cases, as evidenced by *Montgomery*'s placement of the burden on the juvenile to prove that he belongs to the protected class of individuals that cannot be sentenced to life without parole. DAA's Brief at 17, 21 (citing *Montgomery*, 136 S.Ct. at 735).

Further, because there is no required fact finding, the Commonwealth states that there is no *Alleyne*-related problem with a judge-only sentencing proceeding. Commonwealth's Brief at 53-54. The sentencing court is simply required to balance

factors and take into account other sentencing considerations, which it routinely does as a matter of discretion in other criminal matters, both in Pennsylvania and as upheld under similar circumstances by other states' intermediate appellate courts. *Id.* at 54-58.

## A. Constitutional Authority

To begin, we reject the Commonwealth's argument that the creation of procedures to implement a substantive rule of law falls to the General Assembly. Rather, the Pennsylvania Constitution clearly and unambiguously bestows upon this Court "the power to prescribe general rules governing practice, procedure and the conduct of all courts" as long as such rules "neither abridge, enlarge nor modify the substantive rights of any litigant, nor affect the right of the General Assembly to determine the jurisdiction of any court or justice of the peace, nor suspend nor alter any statute of limitation or repose." Pa. Const. art. V, § 10(c).

*DeHart* does not constrain the exercise of our authority in this context. That case involved a challenge by a defendant to the General Assembly's authority to create the death penalty sentencing statute. We concluded that this was within the power of the General Assembly "to determine the punishment imposable for criminal conduct." *DeHart*, 516 A.2d at 671 (citing *Commonwealth v. Wright*, 494 A.2d 354 (Pa. 1985), *aff'd sub nom.*, *McMillan v. Pennsylvania*, 477 U.S. 79 (1986)). In contrast, the question here solely pertains to the procedures to implement the sentence for a juvenile convicted of first-degree murder. It does not (as argued by the Commonwealth and the DAA) require us to create the sentence itself. The resolution of the issues presented here falls squarely within our constitutional authority.

The relevant procedural postures of this case and *Sanchez* are strikingly similar. In *Sanchez*, this Court was faced, inter alia, with a challenge to the imposition of capital punishment on a defendant who claimed he was ineligible to receive the death penalty pursuant to *Atkins v. Virginia*. We observed that in the nine years that elapsed following the *Atkins* decision, the General Assembly had remained silent, failing to enact a statute to address how courts should determine if a person is intellectually disabled such that he is immune from execution under *Atkins*. *Sanchez*, 36 A.3d at 52. Further, as in *Miller* and *Montgomery*, the Supreme Court in *Atkins* did not set forth a procedure for determining intellectual disability, instead "leav[ing] to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.* (quoting *Atkins*, 536 U.S. at 317).

We stated that the absence of procedures for assessing a defendant's claim of intellectual disability in capital cases was creating "uncertainty in the lower courts and among criminal law practitioners," which "could lead to different standards and procedures being employed in different courtrooms throughout the Commonwealth." *Id.* "Because there are no substantive constitutional restrictions upon implementation of procedures to decide *Atkins* claims," we concluded that "the procedures we announce … are a proper exercise of our constitutional authority over judicial administration." *Id.* at 62 (citing Pa. Const. art. V, § 10(c)). We therefore exercised our constitutionally-prescribed authority to devise the necessary procedures for implementing *Atkins* in Pennsylvania, including who must adjudicate an *Atkins* claim (judge or jury), when the determination must be made (pre-trial or at the sentencing phase), which party must

bear the burden of proof, and the level of proof required. *Sanchez*, 36 A.3d at 52-53, 62-72.

Contrary to the positions of the Commonwealth and the DAA, that we waited nine years before promulgating procedures for the implementation of the holding in *Atkins* speaks not to the propriety of this Court's authority to have acted sooner, but rather to the infrequency with which a question concerning the imposition of the sentence in question arose. As the *Atkins* Court observed, an individual meeting the clinical definition of intellectually disabled is extremely rare – it is a diagnosis applicable to only around one percent of the population at large. *Atkins*, 536 U.S. at 309 n.5. It follows then that the vast majority of adults are not constitutionally exempt from the death penalty under *Atkins*. Precisely the opposite is true for a juvenile offender facing the potential of serving life in prison without the possibility of parole, as it is the exceedingly rare and uncommon juvenile whose crime reflects his permanent incorrigibility who therefore may be constitutionally sentenced to life without the possibility of parole. *Montgomery*, 136 S.Ct. at 726 (citing *Miller*, 567 U.S. 479-80). *See also Miller*, 567 U.S. at 471 ("only a relatively small proportion of adolescents[] who engage in illegal activity develop entrenched patterns of problem behavior") (quoting *Roper*, 543 U.S. at 570). Thus, unlike the rare consequences of *Atkins*, *Miller* and *Montgomery* impact every juvenile convicted of first-degree murder.

More than a year has passed since the *Montgomery* decision, and it has been five years since the High Court decided *Miller*. The General Assembly has not taken any appreciable steps to create a separate sentencing statute or to revise the existing law so that it applies to juveniles convicted of first-degree murder prior to *Miller*. In the

meantime, several hundred individuals remain in Pennsylvania prisons serving illegal life-without-parole sentences for crimes committed when they were juveniles. *See* Pennsylvania Department of Corrections, Juvenile Lifers Information, http://www.cor.pa.gov/General%20Information/Pages/Juvenile-Lifers-Information.aspx#. WJTznqAo5aT (last visited June 26, 2017). Each of those prisoners, incarcerated for the crimes they committed as juveniles, awaits resentencing. It is abundantly clear that the exercise of our constitutional authority is required to set forth the manner in which resentencing will proceed in the courts of this Commonwealth.

We are now in the undesirable position of yet again having to remand Batts' case for resentencing. This will be the third time that Batts, who is now twenty-six years old, will face sentencing. The DAA's protestations notwithstanding, Batts' argument that sentencing courts would benefit from our guidance in the application of the *Miller* and *Montgomery* decisions is hardly "unfounded" and is certainly not an "assumption." *See* DAA's Brief at 16. Despite the sentencing court's best efforts here, as reflected by its lengthy and thorough recitation of the evidence it considered when resentencing Batts and its recognition of the controlling United States Supreme Court precedent, the lack of procedural safeguards resulted in it failing to properly apply the law to Batts' resentencing. As a result, Batts remains without a final judgment of sentence in this matter a decade after his conviction. Therefore, as in *Sanchez*, "we will exercise our constitutional power of judicial administration to devise a procedure" for the implementation of the *Miller* and *Montgomery* decisions in Pennsylvania.

### B. Presumption

"[A] presumption is a standardized practice, under which certain facts are held to call for uniform treatment with respect to their effect as to proof of other facts." *Commonwealth v. Childs*, 142 A.3d 823, 830 (Pa. 2016) (quoting 2 Kenneth S. Broun, et al., McCormick on Evidence 675-76 (7th ed. 2013)). A presumption arises, inter alia, if a fact constitutes "a conclusion firmly based upon the generally known results of wide human experience." *Watkins v. Prudential Ins. Co. of Am.*, 173 A. 644, 648 (Pa. 1934). A presumption is mandatory and requires the factfinder to find the existence of an "elemental" or "ultimate" fact based on proof of a "basic" or "evidentiary" fact. *Childs*, 142 A.3d at 830; *City of Pittsburgh v. W.C.A.B.*, 67 A.3d 1194, 1204 (Pa. 2013). For a presumption to be warranted, the elemental and basic facts must "truly coincide." *See Commonwealth v. Kelly*, 724 A.2d 909, 911 (Pa. 1999). The question here is whether, pursuant to *Miller* and *Montgomery*, we should adopt a presumption against sentencing a juvenile to life in prison without the possibility of parole. Using the *Childs* construct, the issue is whether the court must find the ultimate fact that an offender is capable of rehabilitation and that the crime was the result of the transient immaturity upon proof of the basic fact that the offender was under eighteen years of age when he or she committed the murder.

The Commonwealth and its amicus not only argue against a presumption that the juvenile is rehabilitable, but go further to urge that pursuant to *Miller* and *Montgomery*, the juvenile offender bears the burden of proving that he or she is not eligible for a life-without-parole sentence. Commonwealth's Brief at 29-31; DAA's Brief at 20-22. We reject both prongs of the Commonwealth's argument. Certain isolated statements in the *Miller* and *Montgomery* decisions might be interpreted to suggest that the offender

should bear the burden of proving that he is among the great majority of juveniles who are not constitutionally eligible for a sentence of life without parole. *See, e.g., Miller*, 567 U.S. at 475 (referring to the characteristics of youth as "mitigating factors"); *Montgomery*, 136 S.Ct. at 726 (stating that at sentencing, "Montgomery had no opportunity to present mitigation evidence to justify a less severe sentence"), 735 (referring to the characteristics of youth as "sentencing factors"), 736-37 (stating that Montgomery and others similarly situated must have the opportunity to show the crime committed did not reflect their irreparable corruption).

However, any suggestion of placing the burden on the juvenile offender is belied by the central premise of *Roper*, *Graham*, *Miller* and *Montgomery* – that as a matter of law, juveniles are categorically less culpable than adults. This central premise arises from "a conclusion firmly based upon the generally known results of wide human experience," which is that the vast majority of adolescents change as they age and, despite their involvement in illegal activity, do not "develop entrenched patterns of problem behavior." *Miller*, 567 U.S. at 471 (referring to this conclusion as "common sense" and "what any parent knows") (citing *Roper*, 543 U.S. at 569-70); *Watkins*, 173 A. at 648. The *Miller* Court reiterated the High Court's longstanding conclusion that the distinctive attributes of youth generally preclude a finding that a juvenile will forever be incorrigible, especially in light of the great difficulty even professional psychologists have in making that determination during a person's youth. *See Miller*, 567 U.S. at 472-73, 479-80.

*Miller*'s holding, "that life without parole is an excessive sentence for children whose crimes reflect transient immaturity," is a "substantive rule of constitutional law."

*Montgomery*, 136 S.Ct. at 735. This, according to *Montgomery*, means that only "the rarest of juvenile offenders" are eligible to receive a sentence of life without the possibility of parole. *Id.* Only in "exceptional circumstances" will life without the possibility of parole be a proportionate sentence for a juvenile.[21] *Id.* at 736. Thus, there can be no doubt that pursuant to established Supreme Court precedent, the ultimate fact here (that an offender is capable of rehabilitation and that the crime was the result of transient immaturity) is connected to the basic fact (that the offender is under the age of eighteen). *See Childs*, 142 A.3d at 830.

The United States Supreme Court expressly left it to the States to determine how the holding in *Miller* was to be implemented in state court proceedings. *Montgomery*, 136 S.Ct. at 735. We therefore conclude that in Pennsylvania, a faithful application of the holding in *Miller*, as clarified in *Montgomery*, requires the creation of a presumption against sentencing a juvenile offender to life in prison without the possibility of parole.

### C. Standard of Proof and Notice

The United States Supreme Court did not outlaw a sentence of life in prison without the possibility of parole for all juveniles convicted of first-degree murder; it is only a disproportionate (illegal) sentence for those offenders who may be capable of rehabilitation. *See Miller*, 567 U.S. at 479-80; *Montgomery*, 136 S.Ct. at 726, 734. Therefore, the presumption against the imposition of this punishment is rebuttable by

---

[21] In fact, while leaving the ultimate procedure for resentencing to the States, the *Montgomery* Court suggested that all juveniles serving illegal mandatory life sentences across the country could be given the opportunity for parole as a matter of course, disposing of the need for States to convene resentencing hearings at all. *Montgomery*, 136 S.Ct. at 736. This, the Court proposed, would require "prisoners who have shown an inability to reform" to complete their life sentences but afford the opportunity for release to offenders who have demonstrated their ability to change. *Id.*

the Commonwealth upon proof that the juvenile is removed from this generally recognized class of potentially rehabilitable offenders. *See Commonwealth v. Rush*, 562 A.2d 285, 287 (Pa. 1989) (reciting the "well established principle of the law of evidence" that a presumption places the burden of proof and the burden of production on the party that seeks to rebut the presumed fact); *Kelly*, 724 A.2d at 911 (recognizing that a presumption operates as proof of the ultimate fact unless and until the opposing party comes forward with evidence sufficient to rebut the presumption); *Commonwealth v. DiFrancesco*, 329 A.2d 204, 208 n.3 (Pa. 1974).

The question then arises as to the standard of proof required to meet this burden. As we have previously recognized, "even in a sentencing proceeding, due process requirements are applicable." *Commonwealth v. Williams*, 733 A.2d 593, 603 (Pa. 1999). Because "not all situations calling for procedural safeguards call for the same kind of procedure," however, we must define "what process is due" for a determination that a juvenile offender is incapable of ever being rehabilitated. *Id.* at 604 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

"The standard [of proof] serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423 (1979). "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Sanchez*, 36 A.3d at 65 (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996)).

There are three standards of proof typically used in Pennsylvania jurisprudence: a preponderance of the evidence, clear and convincing evidence, and proof beyond a reasonable doubt. A preponderance of the evidence is "'a more likely than not inquiry,' supported by the greater weight of the evidence; something a reasonable person would accept as sufficient to support a decision." *In re Vencil*, 152 A.3d 235, 246 (Pa. 2017) (citing *Samuel–Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 35 (Pa. 2011); *J.S. v. Com., Dep't. of Pub. Welfare*, 596 A.2d 1114, 1115 (Pa. 1991)). Clear and convincing evidence requires proof "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Id.* at 237 n.1 (quoting *Commonwealth v. Maldonado*, 838 A.2d 710, 715 (Pa. 2003)) (bracketing omitted). Both of these standards are traditionally applicable in civil matters.[22]

Proof beyond a reasonable doubt, on the other hand, is a criminal standard and carries the highest evidentiary burden. This standard "impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." *In re Winship*, 397 U.S. 358, 364 (1970) (quoting Dorsen & Rezneck, In Re Gault and the Future of Juvenile Law, 1 Family Law Quarterly, No. 4, pp. 1, 26 (1967)).

---

[22] This is not to say that these standards never apply in a criminal context. For hearings on a motion to suppress evidence, for example, the Commonwealth bears the burden of proving by a preponderance of the evidence that the evidence was lawfully obtained. *Commonwealth v. Wallace*, 42 A.3d 1040, 1047 (Pa. 2012). Further, in cases tried before the Pennsylvania Court of Judicial Discipline against judicial officers alleged to have violated the Pennsylvania Code of Judicial Conduct or the Pennsylvania Constitution, the Judicial Conduct Board, as prosecutor, bears the burden of proof by clear and convincing evidence. Pa. Const. art. V, § 18(b)(5). These matters are referred to as quasi-criminal in nature because of the potential for removal from office as a sanction. *See In re Carney*, 79 A.3d 490, 508 (Pa. 2013).

> [W]hile private parties may be interested intensely in a civil dispute over money damages, application of a "fair preponderance of the evidence" standard indicates both society's "minimal concern with the outcome," and a conclusion that the litigants should "share the risk of error in roughly equal fashion." When the State brings a criminal action to deny a defendant liberty or life, however, "the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." The stringency of the "beyond a reasonable doubt" standard bespeaks the "weight and gravity" of the private interest affected, society's interest in avoiding erroneous convictions, and a judgment that those interests together require that "society impose almost the entire risk of error upon itself."

*Williams*, 733 A.2d at 604 (quoting *Commonwealth v. Wright*, 494 A.2d 354, 360 (Pa. 1985)) (bracketing omitted). *See also Santosky v. Kramer*, 455 U.S. 745, 755 (1982).

To determine the standard of proof required to satisfy due process concerns, we must consider (1) the private interest affected; (2) the risk of an erroneous deprivation of the interest through the procedures established; and (3) the value of the government's interest, if any, including "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Williams*, 733 A.2d at 605 (quoting *Matthews v. Eldridge*, 424 U.S. 319, 334-35 (1976)).

The interest at issue here is a juvenile's loss of his or her fundamental right to liberty without the ability, in the future, to demonstrate his or her capacity to mature, change and be rehabilitated over time. The risk of an erroneous decision against the offender would result in the irrevocable loss of that liberty for the rest of his or her life. Further, life without parole is typically a proportionately harsher sentence for a juvenile than it is for an adult, as juveniles will spend a greater percentage of their lives in prison.

*Miller*, 567 U.S. at 475. On the other hand, an erroneous decision in favor of the offender (i.e., sentencing the offender to a term of life with the possibility of parole), carries minimal risk; if the juvenile offender is one of the very rare individuals who is incapable of rehabilitation, he or she simply serves the rest of the life sentence without ever obtaining release on parole. Although the Commonwealth certainly has an interest in ensuring criminals are punished for their actions and that society is protected from further harm committed by them, this interest remains protected by a life-with-parole sentence because there are no guarantees that parole will ever be granted. Further, as it is now impermissible to sentence the great majority of juvenile offenders (past, present and future) to life without parole in the wake of *Montgomery*, we cannot envision the Commonwealth experiencing any appreciable financial burden by requiring it to shoulder a higher burden of proving the youthful offender's eligibility for a sentence that, except in very rare instances, it will not have a basis to seek.

The United States Supreme Court has clearly and unambiguously instructed that the decision that an offender is one of the rare and uncommon juveniles who may constitutionally receive a sentence of life without the possibility of parole must be made with near certainty. The sentencer must determine that the offender is and "forever will be a danger to society," a finding that the High Court found to be in direct conflict with a child's inherent capacity to change. *Miller*, 567 U.S. at 472. To protect youthful offenders from erroneous decisions that foreclose their ability to ever be released from prison, the Supreme Court therefore held that a sentence of life without parole is disproportionate and illegal for a juvenile offender unless that defendant "exhibits such

irretrievable depravity that rehabilitation is **impossible**." *Montgomery*, 136 S.Ct. at 733 (citing *Miller*, 567 U.S. at 479-80) (emphasis added).

Pursuant to our consideration of the attendant due process concerns and the definitive language used by the Supreme Court, we conclude that to overcome the presumption against the imposition of a sentence of life without parole for a juvenile offender, the Commonwealth must prove that the juvenile is constitutionally eligible for the sentence beyond a reasonable doubt. In an effort to satisfy this burden, the Commonwealth may present evidence relating to the factors announced in *Miller* and the factors appearing in section 1102.1(d).[23]

Consistent with the requirements of due process and section 1102.1(b), if the Commonwealth seeks to have the sentencing court impose a sentence of life without parole on a juvenile offender, it must provide reasonable notice to the defendant prior to the sentencing hearing. *See Commonwealth Dep't of Transp., Bureau of Driver Licensing v. Clayton*, 684 A.2d 1060, 1064 (Pa. 1996) ("While procedural due process is a flexible notion which calls for such protections as demanded by the individual situation, the essential requisites are notice and meaningful opportunity to be heard."). *See generally* 18 Pa.C.S. § 1102.1(b).

### D. Expert Testimony

---

[23] As we explain in greater detail later in this Opinion, for purposes of uniformity in sentencing juveniles facing life without the possibility of parole, courts should examine both the *Miller* factors and the section 1102.1(d) factors prior to reaching that decision, regardless of whether the juvenile was convicted pre- or post-*Miller*. *See infra*, pp.80-83. We observe that some of the *Miller* factors are noticeably absent from section 1102.1(d). *Compare* 18 Pa.C.S. § 1102.1(d) *with Miller*, 567 U.S. at 476-78. All of the *Miller* factors, however, must be considered by a court prior to sentencing a juvenile to life without parole. *See Batts I,* 66 A.3d at 297.

There is an undeniable appeal to Batts' contention that expert testimony is necessary for a court to determine that a juvenile offender is permanently incorrigible. *See Graham*, 560 U.S. at 73 ("It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.") (quoting *Roper*, 543 U.S. at 572); *Miller*, 567 U.S. at 479-80. We decline, however, to go so far as to hold that expert testimony is constitutionally required to rebut the presumption against the imposition of a sentence of life without the possibility of parole. Expert testimony is admissible in Pennsylvania if the information is outside of the common knowledge of the factfinder and the testimony of an expert, so qualified based upon his or her "knowledge, skill, experience, training or education," will aid in the understanding of the fact at issue and the expert utilized a generally accepted methodology. Pa.R.E. 702; *Commonwealth v. Delbridge*, 855 A.2d 27, 43 (Pa. 2003). The necessity thereof is thus within the discretion of the sentencing court. *Delbridge*, 855 A.2d at 44. *See also Commonwealth v. Wilson*, 934 A.2d 1191, 1196 (Pa. 2007) (recognizing that the admissibility of evidence at a sentencing hearing is left to the discretion of the sentencing court).

Given the presumption against life without parole and the Commonwealth's burden beyond a reasonable doubt to rebut the presumption, it is difficult to conceive of a case where the Commonwealth would not proffer expert testimony and where the sentencer would not find expert testimony to be necessary. Nonetheless, whether expert testimony is required to rebut the presumption against permanent incorrigibility

beyond a reasonable doubt will be determined on a case-by-case basis by the sentencing court.

## E. Right to a Jury Determination and Automatic Review by Supreme Court

We further disagree with Batts that a jury must make the finding regarding a juvenile's eligibility to be sentenced to life without parole. Batts relies, in part, upon *Alleyne*, wherein the United States Supreme Court held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne*, 133 S.Ct. at 2155. However, the central principle of *Alleyne* and the decision upon which it was based, *Apprendi v. New Jersey*, 530 U.S. 466 (2000),[24] is that a factual finding that increases an individual's punishment is an element of a different, aggravated offense than the charged crime. *Alleyne*, 133 S.Ct. at 2158 ("The touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an 'element' or 'ingredient' of the charged offense.") (citing *United States v. O'Brien*, 560 U.S. 218 (2010); *Apprendi*, 530 U.S. at 483 n.10); *Apprendi*, 530 U.S. at 495-96 (referring to the finding required to enhance the maximum sentence in that case as "an essential element of the offense," which in turn constitutes "an independent substantive offense"). A finding of "permanent incorrigibility" cannot be said to be an element of the crime committed; it is instead an immutable characteristic of the juvenile offender. To render these characteristics crime-specific would contradict the entire premise of the Supreme Court's decisions, which prohibit a sentencer from finding that

---

[24] In *Apprendi* the Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.

a juvenile offender is unable to be rehabilitated based on the crime itself. *Montgomery*, in particular, plainly requires a court to consider the post-crime conduct of a defendant in determining whether life without parole is a permissible sentence. *See id.* at 736 (stating evidence that Montgomery has evolved from a troubled youth to a model prisoner is relevant to show that he is rehabilitable).

Further, the *Montgomery* Court stated directly that the decision of whether to sentence a juvenile to life without parole could be made by a judge. *Montgomery*, 136 S.Ct. at 733 ("*Miller* requires that before sentencing a juvenile to life without parole, **the sentencing judge** take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'") (emphasis added, citation to *Miller* omitted); *see also Miller*, 567 U.S. at 489 (stating "a judge or jury" must consider the specific attributes of the juvenile offender prior to sentencing him to life without parole). Thus, the High Court itself did not recognize juvenile life imprisonment cases to be governed by *Alleyne*.

Batts' contention that capital sentencing procedures should apply, including a determination by a jury before sentencing a juvenile to life without parole and automatic review of the sentence before this Court, likewise fails. He bases this argument solely on the comparison made by the *Miller* and *Graham* Courts between juvenile life in prison and adult capital punishment. Although there is no question that the *Miller* and *Graham* Courts compared a juvenile life-without-parole sentence to capital punishment and that the punishments have many similarities, as stated above, *Miller* and *Montgomery* both found that it is appropriate for a judge to make sentencing decisions

for juveniles facing a sentence of life without the possibility of parole. *Montgomery*, 136 S.Ct. at 733; *Miller*, 567 U.S. at 489.

Batts' suggestion that appeals from the imposition of a sentence of life without parole should be taken directly to this Court necessarily fails. This Court does not have jurisdiction over direct appeals from the entry of a life-without-parole sentence by a court of common pleas. Such appeals are exclusively within the jurisdiction of the Superior Court. *See* 42 Pa.C.S. §§ 722, 742. It is beyond the scope of this Court's authority to interfere with "the right of the General Assembly to determine the jurisdiction of any court." Pa. Const. art. V, § 10(c).

The procedures we have established provide juveniles facing a potential sentence of life without parole with heightened due process protections. It is our intention that adherence to these procedures will curtail the imposition of illegal sentences of life without parole by sentencing courts. We expect that the proper employment of these procedures will result in courts sentencing juveniles to life without parole in only the rarest of circumstances, as contemplated and prescribed by the United States Supreme Court.

## F. Discretionary Sentencing Determination

If, after a hearing and consideration of all of the evidence presented, the sentencing court finds that the Commonwealth has satisfied its burden of proving beyond a reasonable doubt that the juvenile is so permanently incorrigible that rehabilitation of the offender would be impossible, the bar against sentencing a juvenile offender to life without the possibility of parole is lifted. Despite the certainty of its conclusion that the offender can never be rehabilitated, however, it is left to the

sentencing court's discretion whether to impose a life-without-parole sentence or to instead impose a sentence that would allow the juvenile to have an opportunity for parole consideration.

When sentencing a juvenile to life in prison with the possibility of parole (regardless of whether a life-without-parole sentence was sought by the Commonwealth), the sentencing court should be guided by section 1102.1(a) in determining the minimum term of imprisonment. Although not directly applicable to juveniles convicted of first-degree murder prior to *Miller*, as Justice Baer recognized in his concurrence in *Batts I,* we cannot ignore the policy determination made by the General Assembly as to the minimum sentence a juvenile convicted of first-degree murder must receive. *See Batts I,* 66 A.3d at 300 (Baer, J., concurring). Our instruction to seek guidance from the statute is not intended to intrude upon a sentencing court's discretion to determine an appropriate, individualized sentence for a given offender, but instead to advance the long-recognized goals of uniformity and certainty in sentencing decisions. *See id.*; *Walls*, 926 A.2d at 961 n.3, 964; *Commonwealth v. Riggins*, 377 A.2d 140, 148 n.22 (Pa. 1977) ("Disparity in sentencing is one of the most criticized aspects of the sentencing process."); *see also Commonwealth v. Martin*, 351 A.2d 650, 660-61 (Pa. 1976) (Nix, J., dissenting) (recognizing that sentences in Pennsylvania must be individualized, but stating that "where there are no significant differences in the nature of the crime and the background of the offender to dictate a contrary result," uniformity in sentences is a laudable goal). "[W]hen two defendants occupy roughly the same position in terms of those factors which bear on the severity of a sentence, there

can be nothing suspect about the imposition of identical sentences." *Commonwealth v. Chestnut*, 500 A.2d 1225, 1225 (Pa. Super. 1985).

The legislative guidance is particularly useful because the Sentencing Guidelines adopted by the Pennsylvania Commission on Sentencing do not include a guideline sentence for an individual convicted of first-degree murder prior to *Miller*. *See* 204 Pa. Code §§ 303.15-303.16 (amended 2008, 2012, 2013, 2014, 2015). Similar to the Sentencing Guidelines applicable to other crimes, we believe that section 1102.1 will "help frame the exercise of judgment by the court in imposing a sentence" and "may provide an essential starting point … that must be respected and considered" when determining the appropriate minimum sentence for a juvenile convicted of first-degree murder prior to the *Miller* decision. *See Walls*, 926 A.2d at 964-65.

For some of the juvenile first-degree murder cases, the only appreciable difference between offenders will be the date of conviction. Therefore, to promote uniformity in sentencing in pre- and post-*Miller* cases, when determining the appropriate minimum term of incarceration for pre-*Miller* offenders being sentenced to life with the possibility of parole, sentencing courts should be guided by the minimum sentences contained in section 1102.1(a) of twenty-five years for a first-degree murder committed when the defendant was less than fifteen years old and thirty-five years for a first-degree murder committed when the defendant was between the ages of fifteen and eighteen.[25] 18 Pa.C.S.A. § 1102.1(a).

---

[25] Like the caveat in Justice Baer's concurrence in *Batts I,* our directive that sentencing courts should be guided by section 1102.1 does not result from a review of the constitutionality of the statute. *See Batts I,* 66 A.3d at 300 n.1 (Baer, J., concurring). Such consideration must await a challenge, if any should arise, in another case. (continued…)

## G.  Other States

Our adoption of a presumption against life without parole for juvenile offenders finds support in the decisions of the highest appellate courts in other states that have been faced with this question.[26]  Missouri prohibits sentencing a juvenile to life without

---

(…continued)
Rather, our decision here is based upon the policy determination and legislative intent embodied in section 1102.1 and the goal of uniformity in sentencing.

Neither party has argued that section 1102.1 must be applied to pre-*Miller* juvenile offenders.  Further, there is no constitutional challenge to the prospective nature of the statute, and in the absence of such a challenge, we are without authority to strike the effective date.  1 Pa.C.S. § 1925.  There is no impediment, however, under the Statutory Construction Act or otherwise, to our instructing sentencing courts to use the new legislative provision as guidance without making it mandatory.

[26]  Our research reveals that the trend among our sister states is to outlaw entirely the sentence of life without parole for juvenile offenders.  Seventeen states and the District of Columbia currently prohibit juvenile offenders from being sentenced to life in prison without the possibility of parole.  Prior to *Miller*, only six states (Alaska, Colorado, Kansas, Kentucky, Montana and Oregon) banned the sentence.  Following *Miller*, nine more states (Connecticut, Delaware, Hawaii, Massachusetts, Nevada, Texas, Vermont, West Virginia and Wyoming) and the District of Columbia eliminated the punishment. Another two states (Iowa and Utah) instituted a ban after *Montgomery*.  The bar to the punishment in the majority of these states came through the actions of their legislatures; only Iowa and Massachusetts reached this determination through court decisions. Although Batts included a challenge to the constitutionality of a discretionary life-without-parole sentence imposed upon a juvenile in his Pa.R.A.P. 1925(b) statement, we rejected a similar challenge on Pennsylvania constitutional grounds in *Batts I*. *Batts I*, 66 A.3d at 297-99.  Batts did not again raise this claim in his petition for allowance of appeal or include any argument in support thereof before this Court.  We therefore do not revisit this question.

Nearly all states have considered the impact of *Miller* and *Montgomery* on their sentencing practices.  Some have concluded that a specific finding of permanent incorrigibility is required before it is permissible to sentence a juvenile to life without parole.  *See, e.g., Veal v. State*, 784 S.E.2d 403, 412 (Ga. 2016).  Others have simply required courts to consider the *Miller* factors at a sentencing hearing.  *See, e.g., Ex parte Henderson*, 144 So.3d 1262, 1283-84 (Ala. 2013).  However, as was the circumstance for this Court in *Batts I,* these state courts have not yet faced the question of whether a presumption against the sentence is required.  Our research further (continued…)

parole unless the State proves beyond a reasonable doubt that the *Miller* factors allow the imposition of the sentence. *State v. Hart*, 404 S.W.3d 232, 235 (Mo. 2013). Prior to their respective legislatures eliminating life without parole as a sentence for a juvenile offender, the High Courts in both Utah (pursuant to a statute) and Connecticut found there to be a presumption against the sentence for a juvenile offender. *See State v. Houston*, 353 P.3d 55, 69-70 (Utah 2015); *State v. Riley*, 110 A.3d 1205, 1214 (Conn. 2015). The Supreme Court of Iowa likewise initially found there to be a presumption against sentencing a juvenile to life without parole, but subsequently outlawed the sentence as applied to juveniles completely. *See State v. Seats*, 865 N.W.2d 545, 555 (Iowa 2015); *State v. Sweet*, 879 N.W.2d 811, 839 (Iowa 2016).

## VIII. Conclusion

For sentencing purposes, there is a presumption against the imposition of a sentence of life without parole for a defendant convicted of first-degree murder committed as a juvenile. The Commonwealth must give reasonable notice of its intention to seek a sentence of life without the possibility of parole. To rebut the presumption, the Commonwealth has the burden to prove, beyond a reasonable doubt, that the juvenile offender is permanently incorrigible and thus is unable to be rehabilitated. Consistent with the mandate of *Miller* and *Montgomery*, for a life-without-

---

(…continued)
reveals that none of the highest courts in other states have ruled that *Miller* requires either expert testimony or a jury determination pursuant to *Apprendi* and its progeny for a juvenile to constitutionally be sentenced to life without the possibility of parole. *But see People v. Skinner*, 889 N.W.2d 487 (Mich. 2017) (Michigan Supreme Court granted allowance of appeal to consider "whether the decision to sentence a person under the age of 18 to a prison term of life without parole under MCL 769.25 must be made by a jury beyond a reasonable doubt" pursuant to *Apprendi*).

parole sentence to be constitutionally valid, the sentencing court must find that the juvenile offender is permanently incorrigible and that rehabilitation would be impossible. The Commonwealth's evidence and the sentencing court's decision must take into account the factors announced in *Miller* and section 1102.1(d) of the Crimes Code. Even if the Commonwealth satisfies its burden of proof, the sentencing court is not required to impose a life-without-parole sentence upon a juvenile offender.

In sentencing a juvenile offender to life with the possibility of parole, traditional sentencing considerations apply. *See* 42 Pa.C.S. § 9721(b). The sentencing court should fashion the minimum term of incarceration using, as guidance, section 1102.1(a) of the Crimes Code.

The decision of the Superior Court is hereby reversed. We remand the case to the sentencing court for further proceedings consistent with this Opinion. Jurisdiction relinquished.

Chief Justice Saylor, Justices Todd, Dougherty, and Wecht join the opinion.

Justice Wecht files a Concurring Opinion in which Justice Todd joins.

Justice Baer files a Concurring and Dissenting Opinion.

Justice Mundy did not participate in the consideration or decision of this matter.